# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL D. GREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>MORNINGSTAR, INC., PRUDENTIAL INVESTMENT MANAGEMENT SERVICES LLC, AND PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY,<br><br>        Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

1.       Plaintiff Michael D. Green ("Plaintiff") brings this action on behalf of himself and all other similarly situated retirement plan participants nationwide against Defendants Prudential Investment Management Services LLC ("PIMS"), Prudential Retirement Insurance and Annuity Company ("PRIAC") (collectively, "the Prudential Defendants"), and Morningstar, Inc. ("Morningstar").

## <u>NATURE OF THE ACTION</u>

2.       Plaintiff is an employee of Rollins, Inc.  He is a participant in the Rollins retirement plan ("the Rollins Plan"), which is subject to both RICO and ERISA, among other federal laws. The Rollins Plan is a defined contribution retirement plan with assets of roughly $500 million and more than 10,000 participants and beneficiaries.  Defendants are investment analysts, investment-related software developers, investment consultants, recordkeepers and/or investment managers with respect to the Rollins Plan and other 401(k) retirement plans across the country. Defendants

supplied Plaintiff, the Rollins Plan, and other plans (together with the Rollins Plan, the "Plans") with a plan participant-level automated investment advice program under the tradename GoalMaker.

3.       Plaintiff and the other participants in the Plans used and were injured by this innocuous-sounding "investment advice" program – which in reality was a predatory racketeering enterprise developed, maintained and marketed by Defendants.  Defendants' so-called "investment advice" program gets retirement plan investors to turn over the investment management of their Plan accounts to Defendant PRIAC.  PRIAC, along with its corporate siblings who facilitated the instant racketeering scheme, is a core part of the RICO racketeering enterprise at issue here (the "Enterprise").

4.       Defendants Morningstar and the Prudential Defendants built together and marketed as a "paradigm change" in investing – *which they say they give away to retirement plan sponsors for free* – the "investment advice" program at issue here, which technically speaking is a retirement plan asset allocation software application.  (*See*, *e.g.*, http://www.osc.ct.gov/benefits/docs/prudentialtransition.pdf ("GoalMaker was developed by Morningstar Associates, LLC and is offered at no cost.") (last viewed March 9, 2017).)  This application steers retirement investors like Plaintiff into high-cost investments that pay unwarranted fees to Defendants.

5.       As a 401(k) plan, the Rollins Plan allows plan participants like Plaintiff to contribute a portion of their salary and wages on a pre-tax basis in order to save for retirement. It is an "individual account plan" as defined in Section 3(34) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(34), meaning it is "a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed

to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account." Rollins, as the employer-sponsor of the Rollins Plan, makes matching contributions to supplement the employees' contributions. The Plans also work this way.

6.      The Rollins Plan designates a number of mutual funds or other collective investment funds as the Plan's "designated investment alternatives" – currently seventeen separate choices, including a Rollins stock fund – and gives individual Rollins Plan investors the ability to choose how their Plan accounts will be invested by allocating their accounts among those designated investment alternatives. Like the other Plans, the Rollins Plan purports to transfer the entire responsibility and liability for investment decisions to the Plan investors.[1]

7.      As recognized by the Employee Benefit Security Administration ("EBSA") of the U.S. Department of Labor ("DOL"), "[g]iven the rise in participation in 401(k) type plans and IRAs, the retirement security of millions of America's workers increasingly depends on their investment decisions. ***Thus, there is increased recognition of the importance of investment advice in helping participants avoid costly investment errors***."[2] (Emphasis added.)

8.      Along with the recordkeeping and other administrative services it sells to individual account ERISA-covered retirement plans such as the Rollins Plan, PRIAC includes GoalMaker, which, as noted above, is a plan participant-level automated investment advice program.

9.      GoalMaker is a computer-based asset allocation program that automatically allocates a Plan investor's account among various Plan investment options based on the investor's

---

[1] These plans, including the Rollins Plan, are referred to in this respect as "404(c) plans." *See* ERISA section 404(c), 29 USC § 1104(c) and the regulations thereunder.
[2] EBSA Fact Sheet, "*Proposed Regulation to Increase Workers' Access to High Quality Investment Advice,*" Fe. 26, 2010, available at http://www.dol.gov/ebsa/newsroom/fsinvestmentadvice.html (last reviewed March 24, 2016) (emphasis added).

age, income, savings rate and other data and, as alleged herein, based on the goal of advancing the interests of the Enterprise.

10. GoalMaker "uses Morningstar's technology" to allocate retirement investing assets. (*See*

https://www.alexandriava.gov/uploadedFiles/finance/info/pension/Minutes20120627.pdf (last viewed on May 3, 2017).)

11. In furtherance of the instant racketeering activity, the computer software underlying GoalMaker and/or the implementation of the program has been modified by Morningstar and/or one or more of the Prudential Defendants for use by PRIAC's retirement plan customers. As disclosed in a Prudential presentation promoting the GoalMaker program, "Morningstar Associates is a registered investment advisor and wholly owned subsidiary of Morningstar, Inc. ***Morningstar Associates provides consulting services to Prudential with respect to the GoalMaker model portfolios*** and in no way acts as an investment advisor to investors of Prudential's products or services. ***The GoalMaker model portfolio allocations were developed by Morningstar Associates within a set of guidelines determined by Prudential.***"[3]

12. Both the Prudential Defendants and Morningstar, through concerted racketeering action, including but not limited to "consulting" meetings and joint GoalMaker-related asset allocation computer modeling work, arranged for GoalMaker to influence Plan investors including Plaintiff to invest in high-cost retirement funds that kick back unwarranted fees to the Prudential Defendants by limiting the investment choices otherwise available to Participants in the Plans that

---

[3] *See, "The 'How Do I Choose My Investment' Challenge,"* dated April 5, 2012, available at *http://docplayer.net/14950775-Optional-asset-allocation-program-for-participants.html* (last viewed March 3, 2017) (emphasis added).

would be included in the GoalMaker asset allocation program.

13.    Defendants influenced the Plans here to use GoalMaker by giving GoalMaker away to the Plans ostensibly for free – even though, as explained below, Prudential characterizes GoalMaker as an asset allocation device so valuable as to constitute a "paradigm shift" in retirement investing.

14.    Prudential tells Plan investors that "GoalMaker is an optional asset-allocation service that you can use to automatically diversify your investments among the [] investment options that are in your plan[.]"  Jim Mallozzi, Senior Vice President at PRIAC, stated that GoalMaker "offers unbiased asset allocation modeling during the accumulation and distribution phases of retirement planning[.]"

(*See*  http://www.businesswire.com/news/home/20070711005990/en/Prudential-Creates-Unique-Retirement-Option-Powered-Morningstar  (adding that GoalMaker "simplifies investment decision-making through unbiased asset allocation modeling, and it provides participants with an extremely flexible, automatic answer to generating income using their fund assets at retirement") (last viewed January 29, 2017).)

15.    GoalMaker, however, is not "unbiased."  As it was designed to do by Morningstar, which built and has modified GoalMaker to the Prudential Defendants' specifications, GoalMaker systematically influenced Plaintiff and the Plans to put their money into a variety of high-cost retirement funds that paid excessive fees to the Prudential Defendants.

16.    Defendants did so by requiring Plan sponsors electing to offer GoalMaker to its retirement plan participants to restrict the number and identity of a Plan's investment options that would be included in the GoalMaker asset allocation. Defendants actively developed and marketed GoalMaker to retirement plan participants like Plaintiff.  Defendant PIMS, for instance, handles

GoalMaker advertising to retirement investor groups, stating in one such advertisement that "[n]ow may be a good time to revisit your asset allocation strategy by . . . using GoalMaker." And PIMS says in the same advertisement that retirement investing doesn't have to be difficult – "[a]nd with GoalMaker's help, it isn't." (*See* http://www.retire.prudential.com/media/managed/iratoolkit.pdf (last viewed March 31. 2017).) Likewise, PIMS marketed GoalMaker to large hospital retirement plans by saying it was "[a] simple solution that helps employees utilize professionally designed portfolios that rebalance over time." (*See* http://healthcare.prudentialretirement.com/fact-sheet.php (last viewed January 29, 2017).) PIMS also says that, as concerns GoalMaker and related services, "GoalMaker's model allocations are based on generally accepted financial theories that take into account the historic returns of different asset classes." (*Id.*)

17. The GoalMaker-related fees Defendants imposed on Plaintiffs that are at issue here, however, were not bona fide, good faith fees for work actually performed by Prudential, as explained further below. Instead, they are and were deceptively and/or incompletely disclosed fees taken by Defendants from Plaintiff and the proposed Class in bad faith for an essentially Tammany-esque reason: Defendants seen their opportunities and they took 'em. (*See, e.g.*, http://historymatters.gmu.edu/d/5030/ (last viewed August 2, 2017).)

18. When a retirement investor like Plaintiff uses GoalMaker to manage the investment of his or her retirement plan account, he or she is ceding to the Prudential Defendants the authority to direct the investment of that account. As described by the North Carolina Department of State Treasurer, with respect to the GoalMaker investment options provided to participants of certain retirement plans for North Carolina state employees, the GoalMaker Model Allocations

> are a modified version of ***an off-the-shelf asset allocation model from Morningstar. Morningstar provides their services to Prudential Retirement, as the plan recordkeeper, and the allocations are presented to the participants through Prudential's GoalMaker® service offering as GoalMaker® Funds***. The recordkeeper [which is one or more of the

Prudential defendants here, in many if not all cases Defendant PRIAC] automatically allocates any contributions and distributions across the investment options in the model, in order to maintain the targeted Model Allocation. The recordkeeper rebalances the allocation across the investment options back to the target allocation on a quarterly basis.

(*See* https://www.nctreasurer.com/ret/Board%20of%20Trustees/Glidepath%20Project %20Update%20Tab%203.pdf (last viewed on March 9, 2017) (emphasis added).)

19.     When the Plans use GoalMaker, GoalMaker does not take into consideration each Plan's entire menu of designated investment alternatives.  For example, with respect to the Rollins Plan, of the sixteen designated investment alternatives (not including the Rollins Stock Fund), only seven are utilized by the GoalMaker program*.  In other words, instead of steering Plan participants into the best and most cost effective investment options available to them, GoalMaker sent Plaintiff and other Class member investors into high-cost retirement funds because doing so benefited Defendants*.

20.     As concerns the Rollins Plan, for the so-called mid cap equity asset class, GoalMaker includes the Goldman Sachs Mid Cap Value Fund, Class A shares, with a total expense ratio of 1.16%. But it excludes the generally comparable but much less expensive Vanguard Mid Cap Index Fund Admiral share class, which has a total expense ratio of only 0.08%.  The Vanguard fund pays no revenue sharing kickbacks to PRIAC, whereas the Goldman Sachs fund makes revenue sharing payments to PRIAC in the amount of 25-40 basis points of the investment in the fund.

21.     As another example, for the international equity asset class in the Rollins Plan, GoalMaker includes only the American Funds EuroPacific Growth Fund, R4 share class, with a total expense ratio of 0.85%, but excludes the generally comparable Vanguard Total International Stock Fund Admiral shares with a total expense ratio of only 0.12%.  PRIAC receives revenue sharing of at least 25 basis points of the amount invested in the EuroPacific Growth Fund,

compared to no revenue sharing from the Vanguard fund.

22.     Defendants through GoalMaker influenced the Plans' retirement investors to invest in high cost investments that pay unwarranted fees to the Prudential Defendants and that directly or indirectly send software development-related, consulting and other revenues to Defendant Morningstar. This did not come by accident.  The investments that GoalMaker automatically selected for Plaintiff and the other Plan investors cost them significantly more than any benefit the GoalMaker program might possibly provide them.

23.     Defendant's racketeering enterprise, in short, works in this manner:  Morningstar designed and maintains a computer-based asset allocation program that will allocate a retirement plan investor's account among the various investment choices available in the investor's retirement plan.  The program is designed to take into account all of the investment choices available in the Plan, other than (i) asset-allocation funds like target date funds[4] and (ii) employer stock funds. Generally, if a Plan offers two comparable funds in the same asset class, the program will choose the lower cost fund, or at least split the allocation between the two funds.  The application of the Morningstar program through GoalMaker, however, was modified or re-engineered according to the Prudential Defendants' direction to reduce or eliminate the possibility that lower-cost funds would not be selected or even considered by GoalMaker, and Morningstar regularly consults with the Prudential Defendants about how to operate GoalMaker to Prudential's liking. PRIAC for all intents and purposes manages the operation of GoalMaker as to the Plans and the Plans' participants, including the assessment of fees through GoalMaker. PIMS continues to promote

---

[4] Target date funds are constantly adjusting the asset allocation of the fund over time, so if a program like GoalMaker included target date funds in the allocation program, it would never be able to achieve its intended allocation because the allocation in the target date fund is constantly changing.

GoalMaker to the Plans and their participants. Defendants do all these things in a pattern and on a coordinated basis in a way that causes loss of money and/or property to Plaintiff and the Class.

24. The investment funds at issue here made the revenue sharing payments to the Prudential Defendants and reduced the Class's retirement plan account balances accordingly. In other words, **the GoalMaker kickbacks were paid out of Plaintiff and the Plan investors' retirement savings**. Again this caused injury to Plaintiff and the Plan investors' money and property.

25. Defendants through the Enterprise systematically influenced retirement investors in the Plans, which Plans number in the hundreds across the country, to invest in high cost investment options through the GoalMaker program. They did so in order to send a windfall of unwarranted fees to the Prudential Defendants and, indirectly, to their business partner, Morningstar. The Enterprise's development, maintenance, marketing and use of GoalMaker to gouge Plaintiff and other Plan investors violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Defendants committed the RICO acts alleged herein willfully and/or with actual knowledge of the activities in question.

26. The pattern of related and continuous RICO-covered acts in question extended over a substantial period of time and proximately caused Plaintiff and the proposed Class here injury to their money and property as described with more particularity below. Even if – and Plaintiff does not concede this is so – one or more Defendants disclosed details about GoalMaker's fund selection mechanism to one or more members of the Class and/or their retirement plan sponsors, and one or more of those plan sponsors ostensibly was ultimately responsible for the use of GoalMaker here, neither fact would relieve Defendants of liability here. First, the Enterprise here has open-ended continuity; that is, it involves past conduct that by its nature projects into the future with a threat

CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

of repetition. Second, any disclosure and/or act of retirement plan sponsor embrace of GoalMaker like the aforementioned does not sever the chain of RICO causation so as to warrant judgment in Defendants' favor – either now or later. *See, e.g., BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011) (in RICO case observing that "[t]he defendants argue that if there is any possible slip 'twixt cup and lips (to continue law by proverb), the plaintiff must prove that it did not occur. Not so. The plaintiff doesn't have to prove a series of negatives; he doesn't have to "'offer evidence which positively exclude[s] every other possible cause of the accident.' " . . . . Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation") (citation omitted).

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962 and 1964 and 28 U.S.C. §§1331, 1332 and 1367.

28.     Venue lies in this District because the Defendant Morningstar resides and can be found and has agents and/or transacts its affairs here.

## THE PARTIES

29.     Plaintiff Matthew D. Green ("Plaintiff") is a resident of South Carolina and a participant in the Rollins Plan.

30.     Plaintiff invested in retirement investment funds through the Rollins Plan and GoalMaker.

31.     Defendant Prudential Investment Management Services LLC ("PIMS"), a subsidiary of Prudential Financial, Inc. ("PFI"), is "a registered broker-dealer[] . . . [that] supports a diverse array of businesses *throughout the Prudential Financial, Inc. . . . enterprise*." PIMS

is, for example, "a distributor of mutual funds and group variable annuity products, an introducing broker for retirement plans, a clearing broker for certain mutual fund platforms, and a full-service broker. Its registered representatives' offer, primarily through third parties and/or to institutions, a variety of securities products, including mutual funds, separately managed accounts, retirement plan securities, limited partnerships, and more. [PIMS] ha[s] offices and operations throughout the United States, but are primarily located in the Northeast[.]" (*See* http://www.prudential.com/media/managed/PIMSBCPCustomerDisclosureFinalv2.pdf (last viewed January 25, 2017) (emphasis added).)  As described above, PIMS plays an integral role in marketing GoalMaker to retirement investors for the Prudential family of companies.

32.     Defendant Prudential Retirement Insurance and Annuity Company ("PRIAC") is, like PIMS, a subsidiary of PFI.  It is an insurance company with its principal place of business in Hartford, Connecticut.   PRIAC is self-described as a "Prudential Financial" company, with Prudential Financial being a service mark of The Prudential Insurance Company of America and its affiliates.   PRIAC provides recordkeeping and other administrative services, including the GoalMaker program, to the Rollins Plan and the other Plans.

33.     Defendant Morningstar, Inc. ("Morningstar"), is an investment research and investment management firm headquartered in Chicago, Illinois.

## DEFENDANTS' MISCONDUCT

34.     The Rollins Plan is an "employee benefit pension plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

35.     The Rollins Plan covers all employees of Rollins and its subsidiaries that participate in the Rollins Plan.

36.     According to U.S. Department of Labor Form 5500 filed by Rollins, the Rollins Plan had more than 10,000 participants as of the end of the 2015 plan year, including active participants, retired or separated participants receiving benefits or entitled to future benefits, and deceased participants whose beneficiaries are receiving or entitled to receive benefits. The Rollins Plan held around $500 million in assets at the end of the 2015 plan year.

37.     At all times material hereto, the Rollins Plan used the GoalMaker asset allocation service to have Plaintiff and other retirement investors "automatically diversify your investments among the following investment options that are in your plan:

● American Funds EuroPacific Growth R4

● Franklin Growth Adv

● Goldman Sachs Mid Cap Value A

● Metropolitan West Total Return Bond Fund

● T. Rowe Price New Horizons

● Vanguard Windsor II Admiral

● Prudential Guaranteed Fund." [5]

38.     GoalMaker selected each and every one of these seven funds for the investment of Plaintiff's account during the Class Period (defined below).

39.     Although there are sixteen investment choices available in the Rollins Plan (plus Rollins company stock), as indicated above GoalMaker utilized only seven of those sixteen choices, including the most expensive investment choices and entirely excluding the least expensive choices, the Vanguard index funds.

---

[5] "The Rollins 401(K) Savings Plan Overview of Plan Investment Options and Fees," dated as of June 30, 2016 (the "Rollins Plan Fee Disclosure"), attached as Exhibit A to this Complaint.

40.     For example, GoalMaker allocates Rollins Plan participant accounts and other Plan investor accounts to the Goldman Sachs Mid Cap Value, Class A shares. These are Investor Class shares. Class A shares have an expense ratio of 1.16%, 40 basis points more than the Goldman Sachs Mid Cap Value Institutional Class shares, and pay PRIAC at least 25 basis points in revenue sharing. Instead, GoalMaker could have used the available Vanguard Mid Cap Index Admiral Fund, which has an expense ratio of only 8 basis points (rather than116) and pays no revenue sharing to PRIAC.

41.     As another example, GoalMaker includes the American Fund EuroPacific Growth, R4 share class, with a total expense ratio of 85 basis points, and pays Prudential at least 25 basis points in revenue sharing. The Rollins Plan could have instead acquired the EuroPacific Growth R6 share class, which has a total expense ratio of only 50 basis points and pays no revenue sharing, saving Plaintiff and other Rollins Plan investors a total of 35 basis points. Or GoalMaker could have included the available Vanguard Total International Stock Index Fund, which charges an expense ratio of only 12 basis points, and thus provided an investment similar to the EuroPacific Growth Fund but with an expense ratio that is 85% less.

42.     GoalMaker for Rollins also includes the Advisor share class for the Franklin Growth Fund, which has an expense ratio that is 17 basis points higher that the available R6 share class, and the T. Rowe Price New Horizons Fund, a small cap stock fund, which has an expense ratio of 79 basis points. The Vanguard Small Cap Index Fund, which is similar to the New Horizons Fund, is an available investment choice in the Plan with an expense ratio of only eight basis points.

43.     The majority of the investment choices selected for inclusion in GoalMaker, which carry substantially higher fees than alternative investments, were chosen exclusively for the

purpose of providing additional and effectively hidden compensation to the Prudential Defendants. This completely belies the assertion of Prudential that GoalMaker is provided at no cost and also shows that the revenue sharing payments at issue in this case were at no time "bona fide" payments for services rendered.

## RACKETEERING ALLEGATIONS

### *The Enterprise*

44.     The Prudential Defendants and their affiliates and agents are "persons" within the meaning of 18 U.S.C. §1961(3).

45.     Based upon Plaintiff's current knowledge, the following persons constitute a group of persons and entities associated-in-fact, hereinafter referred to in this Complaint as the "Enterprise":

    a.      Defendant PIMS,

    b.      Defendant PRIAC and

    c.      Defendant Morningstar

46.     The Enterprise is an ongoing organization that provides investment-related services to hundreds of qualified retirement plans across the country - in particular, an investment advice program known as GoalMaker for individual participants in qualified retirement plans.    This Enterprise engages the production of goods and/or services in and affects interstate commerce.

### *The Predicate Acts*

47.     A RICO predicate act appears at 18 U.S.C. § 1954, which prohibits "person[s] who provides benefit plan services" to "employee pension benefit plans" from "receiv[ing] or agree[ing] to receive or solicit[ing] any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of the actions, decisions, or

other duties relating to any question or matter concerning such plan[.] " *See also United States v. Romano*, 684 F.2d 1057, 1063–64 (2d Cir.), cert. denied, 459 U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982).

48.     Altogether, 18 U.S.C. § 1954 provides that:

Whoever being –

(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or

(2) an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan; or

(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or

(4) *a person who*, or an officer, counsel, agent, or employee of an organization which, *provides benefit plan services to such plan*

***receives or agrees to receive or solicits any fee, kickback, commission***, gift, loan, money, ***or thing of value because of or with intent to be influenced with respect to, any of the actions***, decisions, or other duties relating to any question or matter ***concerning such plan*** or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both: ***Provided, That this section shall not prohibit the payment to or acceptance by any person of bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of his duties as such person***, administrator, officer, trustee, custodian, counsel, agent, or employee of such plan, employer, employee organization, or organization providing benefit plan services to such plan. As used in this section, the term (a) "any employee welfare benefit plan" or "employee pension benefit plan" means any employee welfare benefit plan or employee pension benefit plan, respectively, subject to any provision of title I of the Employee Retirement Income Security Act of 1974, and (b) "employee organization" and "administrator" as defined respectively in sections 3(4) and (3)(16) of the Employee Retirement Income Security Act of 1974.

*Id* (emphasis added).

49.     Section 1954, then, makes it unlawful for a person to receive or solicit "any fee,

kickback, commission, gift, loan, money or thing of value" apart from bona fide compensation or payments in connection with that person's actions or duties regarding an employee pension plan. *Id.*; *see also, United States v. Romano,* 684 F.2d 1057, 1063–64 (2d Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982). Defendants received those things here.

50.     And, also under Section 1954, a RICO defendant may be liable for receiving money and/or other things of value in this setting (assuming all other RICO liability elements are satisfied), either:  (a) "because of" any actions or decisions relating to the retirement plan involved (here, the Rollins Plan or any of the other Plans) or (b) "with intent to be influenced with respect to" any Plan.

51.     Section 1954 thus makes it unnecessary that a RICO defendant had the actual ability to control investment decisions of a retirement plan like the Rollins Plan and the other Plans.  *See United States v. Friedland*, 660 F.2d 919, 925-26 (3d Cir.1981) (finding that attorneys who had served as general counsel to a pension plan and whom trustees consulted at meetings and on an ad hoc basis, but who had no actual authority over the plan's investments, were within the ambit of Section 1954). In any event, one or more of the Prudential Defendants had that "actual ability" here.

52.     Morningstar, members of the Class here, Rollins and the Prudential Defendants and their affiliates and agents, are all "persons" within the meaning of 18 U.S.C. §1961(3). Under Section 1954, Defendants also are variously "administrator[s], officer[s], trustee[s], custodian[s], counsel[s], agent[s], or employee[s] of any employee welfare benefit plan or employee pension benefit plan" and/or "an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan." *Id*.  As detailed below, in the course of providing benefit plan services covered by Section 1954 to Plaintiff, the Rollins Plan and the Class, the

Defendants themselves, or an officer, counsel, agent, or employee of an organization which provides benefit plan services to such plan on their behalf, conspired to and did in fact violate RICO. The Prudential Defendants and Morningstar are "person[s] who… provide[s] benefit plan services" to the Plans, including the Rollins Plan, within the meaning of Section 1954.

53.     The revenue sharing payments that the Prudential Defendants received and the development and consulting fees Morningstar received as a result of developing GoalMaker to steer Plaintiff and Class members to the most expensive investment options in the GoalMaker platform were "kickbacks," "money," and/or other "things of value" within the meaning of Section 1954.

54.     Defendants received those payments: (1) "because of . . . the actions, decisions, or other duties relating to any question or matter concerning such plan" within the meaning of RICO, and/or (2) "with intent" for the Rollins Plan and the other Plans "to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan," in particular, in setting up the GoalMaker platform with the intent to route Plan participants into high cost options that would pay unwarranted fees to the Prudential Defendants.

55.     As such, Defendants violated Section 1954:

  a.   by developing, configuring, consulting about and administering GoalMaker for the Rollins Plan and for the other Plans, intending to receive revenue sharing payments thereby;

  b.   through each instance of the implementation of the GoalMaker program for the Rollins Plan and the other Plans, because of and/or by influencing the selective limitation of investment choices to be utilized by GoalMaker in a manner designed to maximize revenue sharing kickbacks for the Prudential Defendants; and

c. by accepting the instant revenue sharing kickback payments generated as a result of influencing the Plan participants' investments through operation of the GoalMaker platform.

56. The revenue sharing payments received by the Prudential Defendants were not at any time under Section 1954 "bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of [Defendants'] duties as such person . . . or organization providing benefit plan services to such plan."

57. Instead, the GoalMaker program was developed for the purpose of influencing Plaintiff and other Plan investors to choose the most expensive investment options in their plans so that the Prudential Defendants could reap their windfall fees and Morningstar could stay gainfully employed helping them do so. Defendants never clearly disclosed the true purpose and mechanism of the GoalMaker program to Plaintiff and/or the Plans' other investors, nor did Defendants fully, clearly and adequately disclose the nature and extent of the revenue sharing fees they developed and received by virtue of the GoalMaker program. These facts and others alleged herein indicate a common purpose, relationships among the conspiring entities associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes sufficing to make the intstant RICO enterprise actionable. On the subject of Defendants' disclosures, by the way, worth noting in advance of Defendants' likely forthcoming motion to dismiss is that while Defendants' GoalMaker-related disclosure practices indicate a scheme of bad-faith concealment and deception, cases decided in this Court and elsewhere have declined to apply Rule 9(b) to a RICO claim alleging unlawful employee pension fund payments under 18 U.S.C. § 1954 as a predicate act. *See Board of Trustees of Ironworkers Local No. 498 Pension Fund v.*

*Nationwide Life Ins. Co.*, No. 04 C 821, 2005 WL 711977, at *3 (N.D. Ill. March 28, 2005) (holding that "allegations of the predicate acts of embezzlement and unlawful employee pension fund payments [under Section 1954] do not involve averments of fraud within the meaning of Rule 9(b)") (collecting citations); *Nat'l Elec. Benefit Fund v. Heary Bros. Lightning Protection Co.,* 931 F. Supp. 169, 191 (W.D.N.Y.1995) (same).

58.     In an apparent effort to hide this from Plaintiff and other Rollins Plan investors, the Rollins Fee Disclosure suggests participating in the GoalMaker program is free. It also fails to disclose that PRIAC is receiving substantial revenue sharing compensation from the limited number of funds included in the GoalMaker asset allocation program.  Upon information and belief, closely similar or identical fee disclosures were made with respect to the Fee Disclosures for the other Plans.

59.     Likewise, none of the Annual Returns for the Rollins Plan filed on Form 5500 with the Employee Benefits Security Administration ("EBSA") of the U.S. Department of Labor ("DOL") for the past six years provides any information about PRIAC's receipt of indirect compensation, such as revenue sharing, despite the specific requirement of DOL regulations that such information be explicitly disclosed on the Form 5500.

60.     Examination of required disclosures and 5500s for other Plans reveals the same disclosure failure.  For example, the participant fee disclosure for the Autozone Inc. 401(k) Plan, which is also administered by PRIAC and includes GoalMaker, provides no disclosure about the compensation being collected by PRIAC in connection with GoalMaker.  Although the 5500 for the Autozone 401(k) Plan does disclose some revenue sharing received from the Prudential Guaranteed Income Fund and from the Boston Partners Small Cap Value Fund II, there is no disclosure of the indirect compensation received by PRIAC from American Funds EuroPacific

Growth Fund, which pays at least 25 basis points to PRIAC, or from the Delaware Value Fund or the Wells Fargo Small Company Growth Fund.

61.     The Prudential Defendants failed to act in good faith by receiving a commission from investment funds for placing employee benefit plan funds, without disclosing to the Plans the actual commission received. Defendants have nowhere, ever disclosed to the Class the actual fee monies at issue here, which they have made by disloyally operating GoalMaker for their own benefit rather than for the benefit of the Class.

62.     Because Section 1954 uses broad language to protect retirement plan beneficiaries from dishonest or unfaithful fiduciaries, it was meant to reach the intentional failure of Defendants here to inform Plaintiff and the other Plan investors and the Plan that they were extracting fees (and the actual amount of those fees) from the placement of their investments.

### *The Pattern of Racketeering Activity*

63.     Defendants have conducted their Enterprise through a pattern of racketeering activity that has netted the Enterprise millions of dollars in revenue sharing kickback payments from the Rollins Plan and the hundreds of other Plans. They have done this among other things on what the RICO decisions refer to as a "relationship-plus-continuity" basis between the Morningstar and Prudential entities that are members of the complained-of racketeering enterprise here.

64.     On information and belief, PRIAC employees influenced the sponsors of the Plans to limit the designated investment alternatives that would be considered by the GoalMaker program in order to include a disproportionate number of investment alternatives that had high expense ratios or that were Prudential proprietary investment products, thus increasing the revenue to be received by PRIAC and the other Prudential Defendants to the detriment of the Plans and their investors.

65.     Each of these acts by Defendants had the same purpose – to influence Plan participants to choose the GoalMaker option, which resulted in revenue sharing kickbacks to the Prudential Defendants. And each had similar results, which were the Prudential Defendants' receipt of the unwarranted fees at issue here, which were paid by Plaintiff and the proposed Class. Each had similar participants – Defendants and their Enterprise. Each had similar victims – the Plan participants. Each had the same methods of commission – setting up the GoalMaker platform to route retirement plan participants into the kickback-paying investment options. These acts were interrelated by these distinguished characteristics and were not isolated events, but form an ongoing pattern of misconduct.

66.     The Prudential Defendants have given no indication of halting their receipt of revenue sharing kickbacks from the GoalMaker program or of changing the GoalMaker program so that it directs participants into all of a Plan's designated investment alternatives and not disproportionately into options that provide revenue sharing kickbacks to the Prudential Defendants. Nor have Defendants made any indication that they intend to stop implementing the GoalMaker program for new retirement plan investors going forward. Thus, Defendants' conduct indicates the threat of continuing racketeering activity.

67.     As such, Defendants, through their Enterprise, have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

## RICO VIOLATIONS

68.     Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

69.     Through the pattern of racketeering activity described above, Defendants and their co-conspirators have conducted or participated in the conduct of the affairs of the Enterprise.

70.     Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. §1962(d).

71.     Defendants' conspiracy is to increase the revenues and profits they reap from their self-interested administration of GoalMaker. They did this through operation of what they in their own words call an "enterprise" by using GoalMaker in connection with retirement plan clients like the Rollins Plan to influence retirement investors like Plaintiff to choose high-cost funds that make unwarranted and bad-faith payments to Defendants here.

72.     Defendants' aforementioned concealment of the bad-faith scheme described herein violates 18 U.S.C. §1962(d).

## CLASS ALLEGATIONS

73.     Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All investors in Plans covered by 18 U.S.C. § 1954 that use GoalMaker. The Class Period is from the earlier of (i) four years before the filing of this action; or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiff and/or the Class of the existence of Defendants' breach, the first date on which Defendants included in any or all of the Plans the GoalMaker program, and in either case, through the date of judgment. The Class excludes Defendants and any participant who is a fiduciary to the any of the Plans.

74.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons: The Class includes thousands of members and is so large that joinder of all its members is impracticable.

75.     The members of the classes are so numerous as to make joinder impractical. The

-22-

Rollins Plan had around 10,000 participants and beneficiaries during the plan year ending on December 31, 2015, and is believed to have had a similar number of participants and beneficiaries in every year of the proposed Class Period. PRIAC serves as recordkeeper for more than 500 plans, many of which, on information and belief, utilize the GoalMaker program and are larger than the Rollins Plan.

76. There are questions of law and fact common to the Class, including the following:

a. What information Defendants provided to Plan sponsors and/or investors with respect to GoalMaker and with respect to the designated investment alternatives included in GoalMaker;

b. Whether Morningstar was aware that its asset allocation program would be or was being administered by the Prudential Defendants in a manner that included as designated investment alternatives higher-cost investments;

c. If Morningstar was thus aware, what (if anything) Morningstar did to try to stop it or, alternatively, what Morningstar did to effectuate it;

d. Whether the selection of those designated investment alternatives for inclusion in the GoalMaker program systematically and disproportionately excluded low-cost investment choices that paid little or no revenue sharing to the Prudential Defendants.

77. Plaintiff's claims are typical of the claims of the Class proposed here. Defendants' conduct toward Plaintiff is, in its essence, identical to their conduct toward other members of the Class and implicates the same set of concerns in both settings. Like members of the Class, Plaintiff incurred losses in the form of the payment of excessive and unnecessary fees as a result of the RICO activities alleged herein. Such excessive and unnecessary fees reduced the value of Plaintiff's and the Class's retirement investments.

78.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to the interests of the Class and is committed to the vigorous representation of the Class and prosecution of this case. Plaintiff has also retained counsel in this case who are experienced in class action, RICO and retirement plan litigation.

79.     Certification under Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the Class would create a risk of: (A) inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct for the Defendants opposing the classes, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

80.     Certification under Rule 23(b)(2) is also appropriate because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class.

81.     Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the members of the Class predominate over individual questions and because the prosecution of this action on a class basis is superior to other available methods for the fair and efficient adjudication of this controversy. In particular:

        a.      The common questions of law and fact identified above are the core issues presented by this action. The answers to those questions will drive the litigation and resolve the liability issues under the relevant provisions of RICO and applicable case law. There are no individual issues other than the amount of recovery to which each member of the

CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

Class will be entitled should Plaintiff prevail, which can be determined by formula and reference to Plan records and Defendants' concerning the investments at issue here by the Class.

b.     No member of the Class has an interest in individually controlling the prosecution of a separate action, as the claims of all members of the Class are the same and certification of the Class in this action will require a determination that Plaintiff will adequately represent the interests of all members of the Class.  To Plaintiff's knowledge, no separate non-class actions have been filed by any members of the proposed Class.

c.     Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

d.     For many of the same reasons described above, a class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.  The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Even if such actions were viable, the result would be a multiplicity of actions against the same Defendants, involving the same controversy, possibly in multiple jurisdictions.  Individual proceedings would pose the risk of inconsistent adjudications. Plaintiff is unaware of any difficulty in the management of this action as a class action.

## **CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. §§ 1954 and 1962(c))**
**(All Defendants)**

82.     Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

83.     This claim is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c) and 18 U.S.C. §1954.

84.     As set forth above, in violation of 18 §1962(c) and 18 U.S.C. §1954, Defendants have conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

85.     As alleged above, Defendants, through their Enterprise, have violated 18 U.S.C. § 1954 by repeatedly using the GoalMaker program to influence retirement plan participants to choose expensive investment options that pay revenue sharing kickbacks to the Prudential Defendants.

86.     As a direct and proximate result, Plaintiff and members of the Class have been injured in their business or property by the acts constituting the pattern of racketeering activity here.  Specifically, Plaintiff and members of the Class have been injured in their business or property by, among other things, paying higher fees to the Prudential Defendants for retirement investments and accordingly receiving less return on those investments than they would have in the absence of the Prudential Defendants' illegal conduct.  The RICO activities at issue here factually and proximately injured Plaintiff and the proposed Class in their business and property. But for this conduct, Plaintiff and the proposed class would not have been injured as complained of herein. The injury at issue here was not unforeseeable, is not the product of any so-called "intervening causes" and, again, is a direct result of the activities of the RICO enterprise involved here.

87.     Accordingly, Defendants are liable to Plaintiff and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

    A.  An order certifying the Class pursuant to Federal Rule of Civil Procedure 23;

    B.  Awarding compensatory damages to Plaintiff and the members of the Class in an amount to be determined at trial;

    C.  Awarding treble damages to Plaintiff and the Class;

    D.  Issuing an order enjoining the Prudential Defendants from further wrongdoing of the kind alleged herein;

    E.  Awarding to Plaintiff and the class their costs and attorneys' fees;

    F.  Such other relief as may be just and proper.

DATED this 3rd day of August, 2017.

By:    */s/ Austin Tighe*
    Austin Tighe, NDIL Bar No. 90784528
    Michael Angelovich*
    NIX PATTERSON & ROACH, LLP
    3600 N Capital of Texas Hwy
    Building B, Suite 350
    Austin, Texas 78746
    Telephone: (512) 328-5333
    Facsimile: (512) 328-5335
    atighe@nixlaw.com
    mangelovich@nixlaw.com


    Garrett W. Wotkyns*
    John J. Nestico*
    SCHNEIDER WALLACE COTTRELL
    KONECKY WOTKYNS LLP
    8501 N. Scottsdale Road, Suite 270
    Scottsdale, Arizona  85253
    Telephone: (480) 428-0145
    Facsimile: (866) 505-8036
    gwotkyns@schneiderwallace.com
    jnestico@schneiderwallace.com

Todd Schneider*
James A. Bloom*
Kyle G. Bates*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

*Attorneys for Plaintiff*

*Pro Hac Vice application forthcoming

CLASS ACTION COMPLAINT
*Green v. Morningstar, Inc., et al.*