IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL D. GREEN, Individually       )   Docket No. 17 C 05652
and On Behalf of All Others          )
Similarly Situated,                  )
                                     )
             Plaintiffs,             )   Chicago, Illinois
                                     )   October 10, 2017
        v.                           )   9:25 a.m.
                                     )
MORNINGSTAR, INC., PRUDENTIAL        )
INVESTMENT MANAGEMENT SERVICES       )
LLC, AND PRUDENTIAL RETIREMENT       )
INSURANCE AND ANNUITY COMPANY,       )
                                     )
             Defendants.             )


TRANSCRIPT OF PROCEEDINGS - Initial Status Hearing
BEFORE THE HONORABLE VIRGINIA M. KENDALL


APPEARANCES:

For the Plaintiffs:       SCHNEIDER WALLACE COTTRELL
                              KONECKY LLP by
                          MR. GARRETT W. WOTKYNS
                          8501 North Scottsdale Road
                          Suite 270
                          Scottsdale, Arizona  85253

For the Defendant         JENNER & BLOCK LLP by
Morningstar:              MR. CRAIG MARTIN
                          MS. AMANDA AMERT
                          353 North Clark Street
                          Chicago, Illinois  60654

For the Defendant         SIDLEY AUSTIN LLP by
Prudential:               MR. MARK BRUCE BLOCKER
                          One South Dearborn Street
                          Chicago, Illinois  60603

                          PULLMAN & COMLEY by
                          MR. JAMES T. SHEARIN
                          850 Main Street, P.O. Box 7006
                          Bridgeport, Connecticut  06601

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:              GAYLE A. McGUIGAN, CSR, RMR, CRR
                                 Federal Official Court Reporter
24                               219 South Dearborn, Room 2318-A
                                 Chicago, Illinois 60604
25                               (312) 435-6047
                                 Gayle_McGuigan@ilnd.uscourts.gov

1       (Proceedings heard in open court:)

2             THE CLERK:  17 C 5652, Green versus Morningstar.

3             MR. BLOCKER:  Good morning, your Honor.

4             THE COURT:  Good morning.

5             MR. BLOCKER:  Mark Blocker for the two Prudential

6    defendants.

7             THE COURT:  Okay.  Good morning.

8             MR. MARTIN:  Craig Martin and Amanda Amert for

9    Morningstar.

10            THE COURT:  Okay.  Good morning.

11            Next time, feel free to introduce yourself.

12            MS. AMERT:  I'll shuffle to the microphone next

13   time --

14            THE COURT:  Okay.  That's fine.  I think you probably

15   have a trial voice that you can use.

16            Go ahead.

17            MR. SHEARIN:  Good morning, your Honor.

18            Timothy Shearin from Connecticut, also for the

19   Prudential defendants.

20            THE COURT:  Good morning.

21            MR. WOTKYNS:  Good morning, your Honor.

22            Garrett Wotkyns for plaintiff and the proposed class.

23            THE COURT:  Well, do you think you can take them on?

24   You're outnumbered.

25            MR. WOTKYNS:  I don't know.  We'll see.

1          THE COURT:  All right.  Tell me about your case and

2    what you intend to prove.

3          MR. WOTKYNS:  Sure, your Honor.

4          This case is about a systematic scheme whereby the

5    defendants developed, marketed, and maintained -- together,

6    hand in glove -- a so-called robo advisor computer program with

7    respect to retirement plan investing that, by design, sent my

8    client and the entire class into high-cost investments that

9    paid in the manner of kickbacks, fees that are called revenue

10   sharing, which you'll hear a lot about --

11         THE COURT:  Uh-hum.

12         MR. WOTKYNS:  -- to the defendants.  This was by

13   design.  It was not by accident.  We have adduced abundant

14   materials from the public records showing how the defendants

15   worked together to build market and maintain this product, how

16   it harmed our clients.

17         And so per the proposed schedule that we submitted,

18   what we have in mind is a discovery schedule that, frankly, is

19   probably more voluminous than any of us would like, but it's a

20   large complex case, candidly.

21         And I think our proposal was that all discovery would

22   run through the middle of next year, and that class

23   certification briefing would happen at the end of February.

24         Honestly, in my experience, having done quite a few of

25   these cases -- or cases like this, rather -- that's probably

1  erring on the side of ambition and celerity.

2          THE COURT:  Have you been in front of me yet?

3          MR. WOTKYNS:  No, your Honor.  But I see that you

4  share the same passion for expeditiousness, so --

5          THE COURT:  All right.  So what's the loss amount?

6          MR. WOTKYNS:  So the loss will be per class member.

7  It will be the amount of excessive fees that they were charged.

8  There will be a four-year class period, because we're under

9  RICO.  And then damages, of course, will be trebled.  So it

10  will be from the defendants' computer records that we will

11  extract the information about how much, you know, excessive

12  fees were charged on each particular investment.  We'll run

13  that data for four years.  And then we'll have a trial.  And if

14  there's liability, it will be trebled.

15          THE COURT:  Any issues with the Supreme Court's

16  handling of the class action issues before them?

17          MR. WOTKYNS:  I'm sure defendants will have a

18  different answer to this.  In our view, no, your Honor.

19  There's not -- there's no cases on term, to begin with, for

20  this upcoming term as pertains to class certification generally

21  or to RICO more specifically that should bear on this case.

22          Obviously, your Honor is well acquainted with the

23  whole panoply of decisions regarding class certification and

24  the dismissal practice that happens in class actions with *Iqbal*

25  and *Twombly* and the like.

1    I thought in the briefing -- and I'm happy to avoid

2  this or visit this as much as your Honor would like -- I

3  thought it was extremely salient -- and I'm sure you received

4  our view on that from the briefs -- that the *Ironworkers* case

5  that was in this court involves an alleged scheme of revenue

6  sharing with respect to retirement plan investing, the exact

7  same kinds of allegations, with Section 1954 being the

8  predicate act, the exact same assertions by the defendants

9  that, Oh, well, this is actually just business as usual, and,

10  in reality, you know, if you credit some of the scurrilous

11  things that the plaintiff says, even if it wasn't business as

12  usual, it's really a fraud case, and they don't plead it with

13  9(b) specificity, so you should toss it for that reason.  There

14  are, of course, other arguments that were at issue at

15  *Ironworkers* and are at issue in this case.  But *Ironworkers* is

16  dispositive, frankly, of the defendants' motions.

17    Some of the fodder in those motions may be something

18  that your Honor might want to revisit at summary judgment; but

19  right now we have a lot of disputed fact questions, and you

20  have a properly alleged complaint.

21    THE COURT:  All right.  Who wants to take on the

22  scurrilous allegations first and tell me what you think about

23  it?  Anybody.

24    MR. BLOCKER:  Judge, Mark Blocker for the Prudential

25  defendants.

1        THE COURT:  Thank you.

2        MR. BLOCKER:  Your Honor, I don't mean to be strident,

3   but this case is close to specious.  I mean, what this -- this

4   is a civil RICO case, and it purports to claim that a lawful

5   commercial arrangement between Prudential and Morningstar is,

6   in fact, a criminal enterprise.

7        The underlying allegations of civil RICO are

8   deficient.

9        And we filed a motion to dismiss, which is fully

10  briefed and highly --

11       THE COURT:  As of just a couple days ago, right?

12       MR. BLOCKER:  Sorry?

13       THE COURT:  As of just a couple days ago, I think.

14  9/29, right?

15       MR. BLOCKER:  Correct.  That's correct, your Honor.

16       THE COURT:  Okay.

17       MR. BLOCKER:  The lawsuit is really predicated on a

18  fundamental misunderstanding of how GoalMaker works.  That's

19  the product that's at issue.

20       I'll tell you what the plaintiff says, and I'll tell

21  you what the reality is.

22       THE COURT:  That's fine.

23       MR. BLOCKER:  What the plaintiff says happened -- so

24  what GoalMaker is is an asset allocation tool.  If you are a

25  401(k) investor, you may want to allocate in whatever manner

1    you want to allocate, but another option is you can take a

2    pre-set allocation that's disclosed to you and put your money

3    into that, and it's allocated according to a pre-set allocation

4    disclosed to every participant.

5         The way GoalMaker works is it works on a series of

6    templates.  So each template consists of a set of asset

7    classes, the idea being if you're diversified across asset

8    classes, you're more likely to have a good retirement number at

9    the end than if you put all your money into one asset class.

10        So what a plan sponsor will get is they'll say, Okay,

11   I want Template A or Template B, and that has seven asset

12   classes.  They then tell Prudential what -- which of their

13   investment options they want to go into GoalMaker, and then the

14   program functions automatically from there.

15        We don't make any decisions with respect to GoalMaker.

16   All the decisions are made by the plan sponsor.  Here,

17   Mr. Green was with the Rollins Company.  Rollins made all the

18   decisions about what was going to go into GoalMaker.  There was

19   no jiggering of which options were going to go in.  It doesn't

20   choose high-cost options versus low-cost options.  This plan

21   had ones that both had revenue sharing and didn't have revenue

22   sharing.  But all the decisions ultimately are made by the plan

23   sponsor.

24        What the plaintiff says happens is you put your money

25   in, and actually what he thinks happens is somehow the year

1  investment options get changed and put into a higher cost

2  option as opposed to the lower cost option.

3          That's not how it works, your Honor.

4          The plan sponsor decides what's going to be in

5  GoalMaker, and then GoalMaker works on a pre-set percentage

6  that's allocated to each of those investment options.

7          So we don't think there's anything to the underlying

8  merits of the complaint relating to GoalMaker.

9          And we're very interested, as you might imagine, in a

10 quick resolution of our motion to dismiss because we don't want

11 to be trapped in a lawsuit forever that we think, like I said

12 at the outset, is specious.

13         THE COURT:  Okay.  Who else wants to chime in?

14 Although it's the first time I've heard the word "jiggering"

15 used in my courtroom in a long time.  I actually was thinking,

16 Is that a real word?  And it is.

17     (Laughter.)

18         MR. MARTIN:  He's got a lot of big words.

19         In terms of -- I'll just add, briefly, Morningstar is

20 just one step removed then from Prudential.

21         THE COURT:  Okay.

22         MR. MARTIN:  It's Green, Prudential, Morningstar.

23         Morningstar's role is essentially to provide asset

24 allocation models under an agreement with Prudential at a cost

25 of about $350,000 a year.  Morningstar does not direct,

1    control, invest for Mr. Green at all.  He does that, as Mr.

2    Blocker explained.  And we're one step removed.

3        This is pled simply as a RICO case.  Without getting

4    in too far into the motion to dismiss, we filed a very, you

5    know, consistent with the Court's rules and new rules, we filed

6    a motion to dismiss.  It was fully briefed by I think the 18th

7    of September.  The reply brief was filed then.  We think that

8    the case is a straight-up 12(b)(6) motion case, as explained in

9    the briefs.

10        We also, in terms of -- you know, your Honor has done

11   a number of RICO cases, both on the bench and before being on

12   the bench.  This is simply not a RICO case.  It doesn't rise to

13   that level of --

14        THE COURT:  For what reasons?  Because I didn't go

15   through your --

16        MR. MARTIN:  We talked about in our briefs both the

17   enterprise requirement and the predicate act requirement.

18   Those are the two main reasons.  But if you look at the case

19   law, we don't think this even goes close to stating a RICO

20   claim --

21        THE COURT:  Okay.

22        MR. MARTIN:  -- with what is a very common business

23   practice that, you know, is common in the pension markets and

24   401(k) markets.

25        THE COURT:  Okay.  Did you want anything to say, sir?

1     MR. SHEARIN:  Your Honor, just one other point.

2     The alleged kickback is what we call a revenue share.

3     THE COURT:  Right.

4     MR. SHEARIN:  Revenue share has been upheld in the

5  ERISA context by every court that's considered it.

6     Importantly, your Honor, the revenue share here is

7  disclosed to the plan participants and the sponsors.  It is a

8  sponsor-selected decision.  It's how they pay for ERISA

9  services.

10     THE COURT:  Okay.

11     MR. SHEARIN:  And the notion that they're kickbacks is

12  simply the revenue share that the sponsor has decided should be

13  allocated --

14     THE COURT:  The sponsor, what is the term you're using

15  sponsor --

16     MR. SHEARIN:  The Rollins Company who sponsors the

17  401(k) plan.

18     THE COURT:  Oh, okay.

19     MR. SHEARIN:  Rollins chooses to use revenue share to

20  help pay its cost --

21     THE COURT:  I get it.  Okay.

22     MR. SHEARIN:  -- for the plan.  That's fully

23  disclosed.  And that payment is --

24     THE COURT:  That's some kind of contract between them

25  for the 401(k), the sponsor and your --

1    MR. SHEARIN:  Between Prudential and plan sponsor --

2    THE COURT:  Okay.

3    MR. SHEARIN:  -- for recordkeeping expenses.

4    THE COURT:  Okay.  Got it.

5    MR. SHEARIN:  Somehow you have to pay for that.  You

6    either charge the participant a payment, or you take it out of

7    what's called revenue share --

8    THE COURT:  Okay.

9    MR. SHEARIN:  -- which is pay to -- back from the

10   initial mutual fund.  That's all disclosed to both participants

11   and plans.  It's a decision made by the plan sponsor.  There is

12   no other payment.  And, most importantly, the fee paid is set.

13   If it -- if the revenue share comes in higher because more

14   people are in an investment option that's paying revenue share,

15   there's a credit back to Rollins.

16   THE COURT:  Oh, okay.

17   MR. SHEARIN:  If there's a reduction, there's a debit

18   that has to be supplemented.

19   And as far as Morningstar is concerned, they have no

20   play in that at all.  They get no piece of that fee.

21   THE COURT:  Okay.

22   MR. SHEARIN:  Thank you, your Honor.

23   THE COURT:  And so your motion is pending.  It's the

24   same motion.  You're Prudential --

25   MR. MARTIN:  Morningstar, Prudential --

1          THE COURT:  I just linked you over there.

2          Do you have anything you want to add?

3          MS. AMERT:  He covered exactly the point I wanted to

4    make, which is that I believe Mr. Green's allegation is that

5    this revenue sharing payment is a form of kickback.

6          There is no allegation or reason to believe that

7    Morningstar receives any portion of that payment.

8          The record is very clear on the motion to dismiss that

9    Morningstar receives a flat fee for services it performs to

10   Prudential.  It does not interact with the Rollins plan or any

11   other plan sponsor, and it does not receive any portion of this

12   revenue sharing.

13         THE COURT:  Got it.  Okay.

14         Reply?

15         MR. WOTKYNS:  Yeah --

16         THE COURT:  Go ahead.

17         MR. WOTKYNS:  Thank you, your Honor.

18         THE COURT:  Now get back to those scurrilous

19   allegations.

20         MR. WOTKYNS:  You see me chomping at the bit with all

21   my --

22         THE COURT:  I do.  I see you jumping each time they

23   speak.

24         MR. WOTKYNS:  $900 words over --

25         THE COURT:  But I didn't look at you so that hopefully

1   you didn't --

2          MR. WOTKYNS:  No, I appreciate that.  Probably saved

3   all of us a lot of trouble.

4          A couple of things, your Honor.

5          Obviously, we have very capable adversaries here.

6   We've done cases against them before and have ongoing cases

7   against them now.

8          With all due respect to our capable adversaries --

9          THE COURT:  That's trouble when they begin with that

10  phrase.

11         MR. WOTKYNS:  It's like any time a lawyer says, "Let

12  me be honest with you."

13     (Laughter.)

14         MR. WOTKYNS:  You know what's coming.

15         THE COURT:  You know there's something coming down the

16  pike, right?

17         MR. WOTKYNS:  In all candor, what we're talking about

18  right now are disputed factual questions.  For instance, let's

19  take the most important one, in my view, which is, you know,

20  what did Morningstar do here?  What is the relationship between

21  Prudential and Morningstar?  What is the nature of the fees

22  being assessed?  Right?

23         You heard them say -- and go back and see in the

24  transcript repeatedly -- Oh, the record is clear, the record is

25  clear, the record is clear this, the record is clear that,

1    Morningstar did this, the record is clear they only got paid a
2    flat fee for their consulting, the record is clear that no one
3    makes any money off this.

4         Well, the record properly before the Court right now,
5    at the risk of a blinding glimpse of the obvious, is only
6    properly what's before the Court within the four corners of the
7    complaint and anything in the public record that's cognizable
8    and also the material submitted by defendants.

9         I would note with respect to their work order that
10   purportedly limns the whole scope of the relationship between
11   Prudential and Morningstar as concerns GoalMaker, obviously
12   that is a work order that reflects part of the work that
13   Morningstar does with respect to GoalMaker, i.e., the
14   consulting work and the maintenance of the product.

15        We have cited many things in our complaint from their
16   records about how the product was built, how it was configured
17   initially, how Morningstar built it to Prudential's specs, how
18   Morningstar tweaks it to Prudential's specs.  If you look at
19   that work order, it says nothing about how Morningstar was
20   compensated for any of that work.  It says nothing about how
21   Morningstar may or may not be compensated for the joint
22   marketing efforts that they undertake with plan sponsors
23   concerning this product.

24        So first, your Honor, there are a welter of disputed
25   factual questions about those issues.

1            And then second -- and I know we're not here for a

2    full-blown motions hearing, but just so it's before the

3    Court -- there is this canard that percolates throughout the

4    briefing that you just heard again here today, which is revenue

5    sharing is blessed by God, it's wonderful, it's commonplace in

6    the industry, it's been found to comply with ERISA, no harm/no

7    foul.

8            Again, at the risk of a blinding glimpse of the

9    obvious, the fact that there may be some ERISA cases, your

10   Honor, that say revenue sharing does not amount to a fiduciary

11   breach under what your Honor knows to be the ERISA fiduciary

12   duty standard -- which in the words of *Donovan versus Bierwirth*

13   is the highest known to the law -- because it may comply with

14   certain fiduciary duties under ERISA doesn't mean where you

15   have the kind of arrangement alleged in our complaint, which is

16   one where payments systematically are going back and forth

17   within the meaning of 1954, the RICO predicate act, that have

18   the effect of influencing the behavior of retirement investors

19   and plan sponsors where you have those kinds of facts alleged,

20   there's not a single case in the decisions.  The closest thing

21   is actually *Ironworkers*, which we cite at length, your Honor,

22   but there's not a single case that says, Well, you know,

23   everyone in the industry, everyone in the retirement plan

24   industry uses revenue sharing, and they cement it with

25   contracts, so it must be okay.

1          THE COURT:  So when a participant -- or when someone

2     uses GoalMaker, what are they told about their -- what is being

3     done with the investment?

4          MR. WOTKYNS:  Good question, your Honor.

5          What they're told is precisely what we allege in our

6     complaint, what they've said in public, which is it is an

7     unbiased -- their words -- it is an unbiased asset allocation

8     tool that will help people achieve optimum asset allocation for

9     their retirement savings.

10          Talking about disclosure, this is not at all really a

11     disclosure case; but since we're on the subject of disclosure,

12     what people are told -- to answer your Honor's question -- what

13     people are told is:  It's unbiased, it's in your best interest,

14     turn over the keys to us.  Sort of like Napoleon Dynamite, "All

15     your wildest dreams will come true."  That's actually not what

16     happens.  And, in fact, it is, frankly, sinister what does

17     happen, which is folks who use GoalMaker, presumably -- but

18     this is not material to our case -- but, presumably, with the

19     sort of lay understanding that it's in their best interest

20     because that's what Morningstar and Prudential are out there

21     telling the world in their joint marketing presentations --

22     it's a paradigm change in investing.  That's another thing they

23     say about it.  It's a paradigm change, it's so awesome.

24          Well, it's awesome for those who get the higher fees

25     that it produces, but it's not awesome for people like

1    Mr. Green and the class.

2         And the evidence before the Court properly right now,

3    your Honor, is in conflict about what exactly it is, even after

4    *Twombly* and *Iqbal*.

5         And even if every single case before the Supreme Court

6    this term goes against plaintiffs in class action cases, the

7    law will still be that post *Twombly* and *Iqbal*, what we are

8    required to do -- we, being the plaintiffs -- right now is show

9    you that we have put forth a plausible case, that there is a

10   RICO enterprise, RICO harm, that it happened systematically

11   such that you can certify a class, et cetera, et cetera,

12   et cetera, and we have done all those things right now.

13        Now, might Mr. Blocker or Ms. Amert at some point, you

14   know, come up with evidence properly in the record to show

15   that, in fact, Oh, well, these revenue sharing payments are not

16   kickbacks at all, they're put into a big trust fund and that's

17   distributed to UNICEF, and they fly planes over embattled areas

18   of the world, showering dollars on the needy, that might be

19   true, that might be what the evidence shows --

20        THE COURT:  Well, no, you just said they're sinister

21   and scurrilous.  Could they be possibly also --

22        MR. WOTKYNS:  I know.

23        THE COURT:  -- generous?  I can't imagine all of these

24   things --

25        MR. WOTKYNS:  I know.

1    THE COURT:  -- being done.

2    MR. WOTKYNS:  But isn't that -- that's why we have

3  trials, right?

4    THE COURT:  Okay, folks.  Do you want to -- is anyone

5  chomping at the bit to defend your honor?

6    MR. BLOCKER:  Judge, the only thing I would say is the

7  disclosures that we're talking about are attached to our motion

8  to dismiss --

9    THE COURT:  Sure.

10    MR. BLOCKER:  -- as Exhibit 3 --

11    THE COURT:  I have them, yeah.

12    MR. BLOCKER:  -- and 4, so the documents are before

13  your Honor.

14    THE COURT:  Right.

15    MR. BLOCKER:  You can verify what I'm telling you,

16  which is that participants are disclosed exactly what they're

17  going to get when they get into GoalMaker.  They're told the

18  investment options that will be used and the percentages that

19  will be used.  No one is tricked or fooled.  They get exactly

20  what they're told they're going to get.

21    THE COURT:  Okay.  All right.

22    MR. MARTIN:  And, your Honor --

23    THE COURT:  Oh, go ahead.

24    MR. MARTIN:  -- if I may jump in, UNICEF is not

25  involved in the case.

1       (Laughter.)

2           THE COURT:  You didn't send planefuls of dollar bills

3   sprinkling around underdeveloped countries?

4           MR. MARTIN:  And as Ms. Amert explained, the -- we get

5   a $350,000 flat fee.  It's in the papers that are before your

6   Honor.

7           THE COURT:  Okay.  I'll take a look.

8           MR. MARTIN:  As you'll see the law, the -- you go from

9   case to 18 U.S.C., the criminal RICO statute, to RICO.

10          THE COURT:  Right.

11          MR. MARTIN:  There's just no way you get there, but we

12  implore you --

13          THE COURT:  I'll take a look.

14          MR. MARTIN:  -- to read the briefs.

15          THE COURT:  But it might be one that I want to have an

16  oral argument on, just because of such nice diction with all

17  the lawyers, from "welter," haven't heard "welter" in my

18  courtroom in a while.  That was a good one, too.

19          MR. WOTKYNS:  I'll try to bring some new ones --

20          THE COURT:  Good, bring some good ones.

21          Okay.  So give me -- this one may take a little bit

22  longer.  I haven't dug into it yet, so let's see where we

23  stand.

24          It's October 10th already.  Oh, my goodness.

25          I'm going to have you come back on December 11th for

1   your status.  That will give me eight weeks to take a peek at

2   everything.  Only because I have so many pending right now,

3   okay?  And I'll hopefully have a ruling by then as to whether

4   you're moving forward.

5          And if I decide that oral argument might be helpful,

6   I'll call you in.  Okay?

7          MR. BLOCKER:  Judge, I think we do have, I don't

8   remember the date, but maybe a November 10 status as well.

9   Should we strike that?

10         MR. MARTIN:  November 20.

11         THE COURT:  Yes.  Please strike that so that I can

12  just have a little more time to review it.  Okay?

13         MR. BLOCKER:  That's fine.  I just wanted --

14         THE COURT:  Are you all local?  Are you all local

15  lawyers?  Are you from Chicago, all of you?

16         MR. MARTIN:  We're from Chicago.

17         THE COURT:  Okay.  All right.  So -- you are?

18         MR. WOTKYNS:  I'm hesitating because -- no, I'm in

19  Arizona, but we have so many Chicagoans in Scottsdale --

20         THE COURT:  I'm just wondering about oral argument if

21  I order it.

22         MR. WOTKYNS:  It's no problem to come back.

23         THE COURT:  Okay.  All right.  Thanks very much,

24  folks.

25         MR. MARTIN:  Your Honor, I'm sorry, we have one other

1   issue that I --

2           THE COURT:  Oh.

3           MR. MARTIN:  -- feel compelled to raise, and that is

4   the pilot program --

5           THE COURT:  Yes, we're excluded, though -- aren't

6   class actions excluded?

7           MR. MARTIN:  Not in this case.

8           MR. BLOCKER:  It probably should be, but they're not,

9   your Honor.

10          MR. MARTIN:  Mr. Blocker wants to rewrite those rules

11  already.

12          THE COURT:  Well, yes.

13          MR. MARTIN:  In terms of we have -- we have been

14  moving on ESI very promptly.  We've proposed a cost-sharing

15  agreement to the plaintiffs.  They came back and essentially --

16  we agreed, but it's subject to your Honor's approval, given

17  those rules.  We agreed to just hold until there's a motion to

18  dismiss ruling.

19          THE COURT:  Okay.

20          MR. MARTIN:  And --

21          THE COURT:  You're not supposed to do that, but

22  under --

23          MR. MARTIN:  We haven't agreed yet.

24          THE COURT:  I know.  So under this situation, I'll

25  find an exception to the pilot program, which I think I'm

1  permitted to do.  I hope I'm permitted to do it.  I don't think

2  the pilot program trumps Article III status, does it?

3      (Laughter.)

4          THE COURT:  I hope not.

5          So just so I can get to the bottom of this before you

6  spend too much money, okay?

7          So let's discuss all of our discovery plan in December

8  when I see you, okay?

9          I thought class actions and patents were excluded, but

10 they're not, huh?

11         MR. MARTIN:  Patents, I believe, are.

12         THE COURT:  I know patents --

13         MR. WOTKYNS:  Patents are.

14         THE COURT:  Okay.  All right.  Have a great day, guys.

15 Thank you.  And woman.

16     (Proceedings concluded at 9:47 a.m.)

17                   C E R T I F I C A T E

18     I certify that the foregoing is a correct transcript of the

19 record of proceedings in the above-entitled matter.

20

21
   _/s/ GAYLE A. McGUIGAN_____        _October 13, 201_7
22 Gayle A. McGuigan, CSR, RMR, CRR                 Date
   Official Court Reporter
23

24

25