IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL D. GREEN, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 17 C 5652 |
| v. | Judge Virginia M. Kendall |
| MORNINGSTAR, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Green brings this putative class action against Defendants Morningstar, Inc., Prudential Investment Management Services LLC ("PIMS") and Prudential Retirement Insurance and Annuity Company ("PRIAC") (PIMS and PRIAC together, the "Prudential Defendants") alleging that they violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") by way of their administration of the Plaintiff's retirement plan and other plans. Currently before the Court are Morningstar's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. 23) and the Prudential Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), or in the alternative for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (Dkt. 38). For the reasons set forth below, Defendants' motions are granted and the complaint is dismissed without prejudice. Plaintiff shall have one more time to replead the cause of action in conformity with this opinion.

# BACKGROUND[1]

Plaintiff Michael Green participates in a defined contribution plan, or a 401(k) Retirement Savings Plan, through his employer, Rollins Inc. Rollins serves as the sponsor for this retirement plan (the "Rollins Plan"), which has more than 10,000 participants and beneficiaries. (Dkt. 1) at ¶¶ 2, 5, 36. Operationally, the Rollins Plan "designates" seventeen different investment alternatives, including one Rollins stock fund, and it "gives individual . . . investors the ability to choose how their Plan accounts will be invested by allocating their accounts among those designated investment alternatives." *Id*. at ¶ 6; *see also* (Dkt. 12-1) (The Rollins 401(K) Savings Plan, Plan 006974, Overview of Plan Investment Options and Fees as of June 30, 2016) at 12 ("You may specify how your future contributions to the plan are directed or make changes to existing investments in your plan either online or by phone. . . . You may direct your new contributions to any investment in the plan. You may direct your new employer contributions to any investment in the plan."). PRIAC provides recordkeeping and administrative services to the Rollins Plan, and in connection with such services, PRIAC offers an optional "plan participant-level automated investment advice program" called GoalMaker. (Dkt. 1) at ¶¶ 2, 8; *see also* (Dkt. 12-1) at 11 ("GoalMaker is an optional asset-allocation service that you can use to automatically diversify your investments among the following investment options that are in your plan . . . ."). PRIAC manages the operation of GoalMaker, which includes the assessment of fees through the program. *Id*. at ¶ 23. PIMS, a registered broker-dealer, generally promotes or advertises GoalMaker to retirement plans and their participants, as well as to other unspecified "retirement investor groups." (Dkt. 1) at ¶¶ 4, 16, 23.

---

[1] The facts are drawn from Green's complaint. For the purposes of Defendants' motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. *See Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

The scheme is as follows. Morningstar, a registered investment advisor,[2] designed GoalMaker, which is technology that "allocate[s] a retirement plan investor's account among the various investment choices available in the investor's retirement plan." *Id*. at ¶¶ 23, 33. In doing this, GoalMaker takes into account each investor's age, income, savings rate and other data. *Id*. at ¶¶ 4, 9. Under normal circumstances, GoalMaker considers the available investment choices (other than target date funds and employer stock funds) and, when choosing between two "comparable funds," the program either will select the lower cost fund for investment or split the allocation between the two comparable funds. *Id*. at ¶ 23. In the scheme alleged here, however, Morningstar modified the GoalMaker program according to certain guidelines set by the Prudential Defendants "to eliminate the possibility that lower-cost funds" would be considered or selected for investment by way of GoalMaker. *Id*. at ¶¶ 11, 23. Morningstar and both Prudential Defendants "regularly consult" about how "to operate GoalMaker to Prudential's liking" and engage in "joint GoalMaker-related asset allocation computer modeling work." *Id*. at ¶¶ 12, 23.

In other words, this particular version of GoalMaker is intentionally designed to "steer[] retirement investors like [Green] into high-cost investments that pay unwarranted fees to Defendants," specifically to the Prudential Defendants by way of revenue sharing agreements that those defendants have in place with certain mutual funds. *Id*. at ¶ 4, 12, 15. To reach this end, the Defendants first "influenced" the Rollins Plan to use GoalMaker by providing it at no cost and then required Rollins to "restrict the number and identity" of the investment options to be included in GoalMaker to disproportionately favor investment alternatives that had high

---

[2] To be clear, Morningstar Investment Management LLC f/k/a Morningstar Associates, LLC is a registered investment advisor and a wholly owned subsidiary of Morningstar, Inc. While Morningstar, Inc. is the entity named as a defendant in this action, the complaint also refers to Morningstar Associates, LLC and the investment advisory and consulting services and licensing agreement relevant to the RICO claim alleged was executed between Morningstar Associates LLC and PRIAC. *See* (Dkt. 1); (Dkt. 24) at 1 n.1; (Dkt. 25-4).

expense ratios or that were Prudential proprietary investment products. *Id*. at ¶¶ 13, 16, 19, 64. For example, with regard to the Rollins Plan, GoalMaker considered only seven of the seventeen available investment options for automatic diversification, and Green alleges that the seven investment funds include the most expensive investment choices and exclude the least expensive choices (the Vanguard index funds). *Id*. at ¶¶ 23, 37–39. Not only are the investment funds available through GoalMaker expensive for investors, but they also were selected because those funds provide "additional and effectively hidden compensation to the Prudential Defendants," or kickbacks, by way of revenue-sharing agreements—revenue sharing agreements that were not disclosed to the investors. *Id*. at ¶¶ 20–22. Green alleges that the revenue-sharing arrangements "deceptively" were not disclosed, that the "true purpose and goal of the GoalMaker program" was never clearly disclosed, and that the "GoalMaker [non-]disclosure practices indicate a scheme of bad-faith concealment and deception." *Id*. at ¶¶ 17, 57; *see also id*. at ¶ 72 (concealment was a "bad-faith scheme").

At some unspecified time, Green used GoalMaker, and the program selected each of the seven available funds for Green's investment. *Id*. at ¶¶ 30, 38. Accordingly, Green alleges that he has paid higher fees to the Prudential Defendants for retirement investments than he would have in the absence of their illegal conduct. *Id*. at 86.

Based on these allegations, Green has brought a one-count complaint alleging that an enterprise made up of PIMS, PRIAC, and Morningstar worked together to procure "kickbacks" in violation of RICO, specifically 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1954, through their self-interested administration of GoalMaker by (1) developing and configuring GoalMaker in a way intended to produce revenue-sharing payments; (2) repeatedly influencing the selective limitation of investment choices to be utilized by GoalMaker in the Rollins Plan (and other

plans) to maximize the revenue-sharing payments made to the Prudential Defendants; and (3) accepting revenue sharing payments, either directly in the case of the Prudential Defendants or indirectly in the form of "software development-related, consulting fees, and other revenues" in the case of Morningstar. *Id.* at ¶¶ 22, 45, 53, 55, 65, 71. Green seeks to bring suit on behalf of investors in all retirement plans (not limited to the Rollins Plan) in which Defendants are involved and that used GoalMaker over the past four years. *Id.* at ¶ 73. According to the complaint, this could involve more than 5,000,000 individual class member investors. *Id.* at ¶ 75.

## **LEGAL STANDARD**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under the federal notice pleading standards, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013). Under Federal Rule of Civil Procedure 9(b), a plaintiff alleging fraud must do so with particularity, which generally means a plaintiff must plead "the who, what, when, where, and how of the fraud." *Camasta*, 761 F.3d at 737.

**DISCUSSION**

RICO is a "unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity"; it does not "cover all instances of wrongdoing." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). When Congress enacted RICO, it chose to supplement criminal enforcement of the provision by providing that "[a]ny person injured in his business or property" by a RICO violation may seek treble damages and attorney's fees. 18 U.S.C. § 1964(c); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). While Congress never intended RICO to be employed to allow plaintiffs to turn garden-variety state law fraud cases into RICO claims, *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007), the breadth of RICO's text and the lure of treble damages and attorney's fees have proven irresistible to plaintiffs intent on federalizing such claims. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499, n.16 (1985) (citing ABA Task Force study finding that only 9% of RICO claims involve "allegations of criminal activity of a type generally associated with professional criminals"); *see also Gamboa*, 457 F.3d at 710 ("While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common law cause of action available to remedy business deals gone sour.") (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992)).

**A.     Standing**

This cause of action requires Green to adequately plead three things: (1) an "injur[y] in his business or property" (2) "by reason of" (3) the Defendants' "violation of section 1962." *See* 18 U.S.C. § 1962(c). Green has alleged that his injury—"paying higher fees to the Prudential Defendants for retirement investments and accordingly receiving less return on those

investments than [he] would have in the absence of the Prudential Defendants' illegal conduct," (Dkt. 1) at ¶ 86—arose from the Defendants' self-interested use of GoalMaker in his retirement account. Defendants first challenge whether Green has standing to bring this action, particularly with regard to step two: that the injury was directly and proximately *caused* by their conduct. In particular, Morningstar argues that its provision of GoalMaker to PRIAC is too remote from the alleged injury to make it a proper defendant. *See* (Dkt. 24) at 6. The Prudential Defendants argue that Green failed to allege both but-for and proximate causation because he failed to allege that he would have paid lower fees if Prudential had not received revenue-sharing payments and also that the independent actions of Rollins (as the sponsor) and Green himself with regard to his investment decisions make his injury too attenuated from Prudential's actions. *See* (Dkt. 38-1) at 12–14. As explained below, however, Green fails at step three of the analysis because the complaint does not sufficiently plead that the Defendants were engaged in the conduct of an association-in-fact enterprise or that each Defendant engaged in a pattern of racketeering activity. As such, the Court does not reach the issue of causation here, but cautions that the matter is not free from doubt.

**B.    Rule 9 Applies to Allegations of Fraud**

Before getting into the elements of Green's RICO claim, Defendants argue that Green has failed to set forth his claim with sufficient particularity. "[T]he dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Thus any claim that is "premised upon a course of fraudulent conduct" may be subject to Rule 9(b)'s pleading requirements. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). By extension then, "[a]llegations of fraud in a civil RICO claim are subject to the heightened pleading standard set

7

forth in Rule 9(b)," *Oberoi v. Mehta*, 2011 WL 1337107, at *1 (N.D. Ill. Apr. 6, 2011), so if the predicate acts alleged sound in fraud, such as mail fraud or wire fraud, they must be pled with sufficient particularity to satisfy Rule 9. *See Goren*, 156 F.3d at 729; *see also Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) (finding "allegations of fraud" within a civil RICO complaint are "subject to the heightened pleading standard" of Rule 9(b)). The parties do not dispute this principle. Rather they dispute whether Green's claimed predicate act—a violation of 18 U.S.C. § 1954—sounds in fraud. At this juncture, the Court need not determine whether Green's allegations of bad-faith concealment and deception in his predicate-act allegations require the application of Rule 9 despite a 2005 opinion from this district that declined to apply the heightened pleading standard to a facially similar civil RICO claim predicated on a violation of § 1954, *see Bd. of Trustees of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*, 2005 WL 711977 (N.D. Ill. Mar. 28, 2005) ("*Ironworkers*"), because the complaint fails to demonstrate the required elements of an enterprise and pattern of racketeering activity under RICO under the lesser pleading standard supplied by Rule 8.

C.  **Green's § 1962(c) RICO Claim is Insufficiently Pled**

Pursuant to § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). In order to establish a violation of § 1962(c) a plaintiff must allege and prove: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

### 1. Conduct of an Enterprise

RICO plaintiffs must allege "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Id.*; *see also Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995) ("A RICO complaint must identify the enterprise."). Here, Green alleges that all three Defendants are persons liable for a pattern of RICO activity and that the enterprise is the association of all three Defendants that constitutes "an ongoing organization that provides investment-related services"—GoalMaker—"to hundreds of qualified retirement plans across the country." (Dkt. 1) at ¶¶ 45, 46. Defendants argue that Green's RICO claim fails because the allegations in the complaint suggest that the Prudential Defendants and Morningstar were merely conducting their own affairs, as opposed to the affairs of an enterprise. *See* (Dkt. 24) at 8–11; (Dkt. 38-1) at 10–12.

Under the RICO statute, an enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To adequately plead an association-in-fact enterprise, which Green alleges here, a plaintiff must allege facts to plausibly suggest "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). This definition is interpreted broadly, but it requires "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*.

As far as structure, Green alleges the following "clear division of labor": Morningstar modified the standard allocation settings in its GoalMaker software and calibrated it to favor funds with revenue-sharing agreements with the Prudential Defendants, PIMS generally

9

advertised GoalMaker, and PRIAC provided GoalMaker to retirement plans, including the Rollins Plan. After GoalMaker was implemented in the Rollins Plan and then used by Green, both Prudential Defendants received monies by way of revenue-sharing agreements they had with the funds included in the Rollins Plan's GoalMaker algorithm. Assuming that such facts adequately set forth the structure of the association-in-fact enterprise, the complaint still fails with regard to the remaining two elements. First, regarding longevity, the complaint does not directly address the duration of the enterprise; it only conclusively mentions the concept in passing, alleging that the facts indicate "longevity sufficient to permit these associates to pursue the enterprise's purpose sufficing to make the instant RICO enterprise actionable." (Dkt. 1) at ¶ 57. Relevant documents submitted in connection with the motions to dismiss indicate that PRIAC began providing services to the Rollins Plan in 2007 and Morningstar began providing services to PRIAC in 2012. But even these documents do not indicate when the alleged *scheme* began, and the further complaint lacks allegations regarding when Green himself utilized the GoalMaker software that eventually led to his injuries.

Second, the complaint fails to sufficiently allege a common purpose among the RICO defendants. The existence of a common goal or purpose is an "essential ingredient" of an association-in-fact enterprise. *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004); *see also Boyle*, 556 U.S. at 946 ("The concept of 'association' requires both interpersonal relationships and a common interest.") (internal quotations omitted). Not only must there be a common purpose or goal, a plaintiff must allege the existence of "an organization with a structure and goals separate from the predicate acts themselves." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009). This is because an enterprise "is something more than a group of

people who get together [and agree] to commit a 'pattern of racketeering activity.'" *Jennings*, 910 F.2d at 1441.

According to the complaint, the ultimate goal of the alleged scheme was to procure revenue-sharing payments made directly to the Prudential Defendants. *See* (Dkt. 1) at ¶¶ 25, 52, 65, 71. As is clear, Green has not alleged—even conclusively—that the Defendants were organized for any purpose *other* than procuring revenue-sharing payments. In other words, if the alleged predicate acts are removed, there is nothing left in the complaint to sustain the allegation of an ongoing, structured enterprise among Defendants. This is not sufficient. *See, e.g.*, *Okaye (U.S.A.), Inc. v. Denne Indus., Inc.*, 2000 WL 1727785, *4 (N.D. Ill. Nov. 20, 2000) (enterprise was not sufficiently pled where the complaint did not plead the existence of a structure apart from the alleged racketeering activity itself and instead merely explained the roles of each defendant without addressing the structure of the enterprise or how the defendants' activities benefited the group as an independent entity).

On this point, Green's response admits the singular purpose of the enterprise and cites only to *Ironworkers*, arguing that a "mutually beneficial revenue sharing arrangement is a sufficient allegation of a common purpose." *See* (Dkt. 44) at 4; (Dkt. 53) at 9; *see also Ironworkers*, 2005 WL 711977, at *5. However, Green's limited citation to *Ironworkers* neglects to consider the full analysis engaged in by that court to reach the common-purpose conclusion cited. By way of brief background, in *Ironworkers*, three pension funds brought two civil RICO claims against four Nationwide entities. To support the RICO claims, the funds alleged the following scheme: three third-party Employee Retirement Income Security Act of 1974 plan administrators who were retained to provide administrative services brought the investment business of the funds to the Nationwide entities, and the Nationwide entities then

charged the funds various fees. After receiving the fees, the Nationwide entities kept a portion of the fees and paid the remainder to the third-party administrators as commissions. Essentially, the administrators recommended that the funds invest their money with the Nationwide entities without disclosing their broker relationship with the Nationwide entities, and then the Nationwide entities shared fees it made from any resultant contracts with the administrators. *Id.* at *1. The funds alleged two possible enterprises: the corporate parent of the Nationwide entities and, as relevant here, the association-in-fact of the Nationwide entities and the third-party administrators. *Id.* at *4. In finding that the association-in-fact theory was adequately pled, the court highlighted the exclusive agreements that the Nationwide entities had with the third-party administrators involved in the scheme, the Nationwide entities' expectations that the administrators would bring them a certain volume of business, and the revenue-sharing between the Nationwide entities and the administrators that "secured" and "ensured" the administrators' continued recommendation of Nationwide services. Based on these allegations, the court found that the revenue sharing that scheme benefitted both the Nationwide entities and the administrators adequately demonstrated a common purpose of conducting a certain volume of business with each other. *Id.* at *5. Put differently, the administrators received commissions and the Nationwide entities received investment referrals. The court further found that the exclusive Nationwide-administrator agreements gave the enterprise both structure and hierarchy as the agreements involved deliberate decisions by the enterprise associates to conduct business only with each other.

Therefore, the *Ironworkers* court's conclusion that the "mutually beneficial revenue sharing arrangement" alleged in funds' complaint adequately set forth a common purpose of the enterprise involved its consideration of many more facts and detail than simply the procurement

of unlawful commissions. Unlike *Ironworkers*, the complaint here improperly relies solely on the alleged predicate acts to supply the common purpose.

Not only that, the complaint does not present a single factual claim asserting that each RICO Defendant had any interest in the outcome of the alleged scheme beyond their own individual interests. For example, there is no indication in the complaint that the RICO Defendants shared in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to the scheme. *See, e.g.*, *Oberoi*, 2011 WL 1337107, at *4 (finding no RICO enterprise where defendants merely made their own respective profits and did not share in the profits of the alleged enterprise). Specifically, Morningstar performed consulting and design work and received consulting and design fees in return. PIMS performed general marketing for the GoalMaker program and then received revenue-sharing payments from investment funds later down the line. PRIAC took the GoalMaker software and actually managed its operation as to the Plans and Plans' participants, and PRIAC is the only Defendant specifically alleged to have received revenue-sharing payments from specific investment funds. (Dkt. 1) at ¶¶ 20, 23, 40. Still, it is true that all of the Defendants are alleged to have received fees and/or payments, but "the shared goal of financial profit, by each party conducting its own business, does not qualify as a 'common purpose' under RICO." *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, 2013 WL 1286696, at *9 (N.D. Ill. Mar. 28, 2013).

For similar reasons, even if the complaint sufficiently alleged the *existence* of an enterprise, it fails to adequately allege that each member of the alleged enterprise—PRIAC, PIMS, and Morningstar—participated in the enterprise's affairs as opposed to simply pursuing their own affairs. *United Food & Commercial Workers Unions & Employers Midwest Health*

13

*Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) ("*Walgreen*"); *see also Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their own affairs"); *accord Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010). Although the complaint alleges that the Defendants formed a "predatory racketeering enterprise," these conclusory assertions need not be accepted as true and no other allegation pushes his complaint across the plausibility threshold. *Goren*, 156 F.3d at 727 ("It is not enough, however, for a plaintiff simply to allege [RICO] elements in boilerplate fashion; instead, [he] must allege sufficient facts to support each element."). The facts that Green does allege are consistent with each Defendant going about its own business, which is insufficient to state a RICO claim.

For example, with regard to Morningstar, the complaint describes consulting meetings that were held and joint Prudential Defendant-Morningstar GoalMaker modeling work that was performed, but nothing in the complaint reveals how one might infer that these meetings or actions were taken on behalf of the enterprise as opposed to on behalf of Morningstar in its individual capacity, to advance its own self interests. Further, the complaint alleges that the only benefit provided to Morningstar was its continued receipt of design and consulting fees; there are no allegations that Morningstar received any additional fees or incentives beyond its customary fees. This "role" is indistinguishable from Morningstar's contractual position as an investment consultant for one or both of the Prudential Defendants. "The statute does not penalize tangential involvement in an enterprise; a plaintiff must plead and prove that a defendant took some part in directing or conducting the alleged 'enterprise' such that it 'participate[d] in the operation or management of the enterprise itself.'" *Crichton*, 576 F.3d at 399 (quoting *Reves*,

507 U.S. at 185). Similarly, "[a]llegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice." *Id.* at 399 (citing *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)); *see also Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 688 (N.D. Ill. 2012) (allegations against alleged RICO participant showed no more than his interest in serving his contractual role as an attorney at a real estate closing; there were no allegations that he used an enterprise to engage in a pattern of racketeering activity). And although Green makes much of the fact that Morningstar was interested in retaining the Prudential business, "a vendor's interest in retaining its business relationship is neither unusual nor suspicious." *D.M. Robinson Chiropractic, S.C.*, 2013 WL 1286696, at *10. Specifically, in *D.M. Robinson Chiropractic*, the court held that allegations that a software licenser, who had no apparent objective aside from enabling and encouraging use of the software program and who was not alleged to have profited directly from the alleged RICO scheme, were not sufficient to demonstrate that the licenser shared the common purpose of defrauding insurance policyholders by way of the use of that same program. *Id*. Likewise, the allegations against Morningstar fail to allege that Morningstar acted to procure unlawful payments from retirement funds, as opposed to retain its business relationship with Prudential.

Even with regard to PIMS and PRIAC, the complaint lacks factual allegations that they were operating with a common goal, as opposed to simply receiving the revenue-sharing payments for which they had bargained with whichever mutual funds they contracted. The complaint lacks any allegations about how either entity acted outside of its commercial bounds to perform the actions of an enterprise. That's not to say that the complaint does not allege illegal

15

activity on the part of the Prudential Defendants, but it does lack allegations regarding the level of coordination and cooperation that rises above normal corporate relationships.

In this way, this case is similar to *Walgreen*. 719 F.3d 849. There, the Seventh Circuit considered a relationship between Walgreens and Par Pharmaceuticals, in which Par persuaded Walgreens to systematically fill certain prescriptions with the most expensive form of the prescribed drug (capsules or tablets, depending on the drug), even if the prescription called for the less expensive form. Notwithstanding extensive communication between Walgreens and Par—which were alleged to include presentations by Par highlighting the millions of dollars of profits to be earned by engaging in the prescription-switching scheme—the court of appeals concluded that the complaint failed to plausibly allege "that Walgreens and Par were conducting the affairs of this [alleged enterprise], as opposed to their own affairs." *Id*. at 854. Because the complaint did not allege that "officials from either company involved themselves in the affairs of the other" and because "nothing in the complaint reveal[ed] how one might infer that [Par and Walgreens's] communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities," the court concluded that the complaint failed to adequately allege that Par and Walgreens engaged in conduct that used or promoted the alleged enterprise rather than merely alleging conduct that was entirely consistent with the individual interests of each actor rather than the interests of a distinct entity—the enterprise. *Id*.

Similarly, in *Goren*, the court held that allegations that defendants who provided various kinds of promotional services for an alleged mail-order mineral-supplement RICO enterprise did not establish the requisite enterprise control or involvement. *See* 156 F.3d at 727–28. The court held that the "averments clearly allege the existence of a business relationship between these

16

defendants and the enterprise, but do not indicate that these defendants 'took some part in directing [the enterprise's] affairs.'" *Id*. at 728 (quoting *Reves*, 507 U.S. at 179). "Indeed, simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself." *Id*.

In light of this precedent, Green's assertion that *Ironworkers* dictates that the complaint is sufficiently pled lacks merit. *See* (Dkt. 44) at 5; (Dkt 53) at 10. In an attempt to mirror the facts of *Ironworkers*, Green argues that the Prudential Defendants here improperly influenced the retirement plan sponsors, such as Rollins, to contract with them "by the revenue-sharing payments at issue." *Id*. But the complaint does not allege that the sponsors were part of or somehow benefitted from the alleged enterprise (like the administrators in *Ironworkers*), and regardless, Green fails to support his argument that this conduct benefitted the enterprise rather than the Defendants individually. Indeed, by his own allegations, the Prudential Defendants acted to generate revenue-sharing payments that were made directly to them. Moreover, the conduct of the enterprise alleged in *Ironworkers* involved not only the racketeering acts alleged (the commission payments), but also steps and actions that the Nationwide entities and the administrators took to formalize their relationship, to keep their revenue-sharing payments confidential, and to protect their relationship by limiting who could be an administrator and fund client. *Ironworkers*, 2005 WL 711977, at *6. Although this case, like *Ironworkers*, involves retirement accounts and revenue sharing fees, it lacks similar allegations of concerted, structured, and purposeful conduct by the Defendants involved. Accordingly, the complaint fails to adequately allege the existence of an enterprise.

### 2. Pattern of Racketeering Activity

The complaint also fails to allege a pattern of racketeering activity. A "pattern" requires at least two acts of "racketeering activity" occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). The term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and includes unlawful employee pension fund payments, indictable under 18 U.S.C. § 1954, which is the predicate act alleged in the instant case. *See* 18 U.S.C. § 1961(1). "To fulfill the pattern requirement, plaintiffs must satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong). *Midwest Grinding Co., Inc.*, 976 F.2d at 1022 (citing *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989)) (emphasis in original); *see also Goren*, 156 F.3d at 728.

At the risk of being repetitive, the Court again notes that the complaint's allegations that the Defendants participated in a pattern of racketeering activity (*see, e.g.*, (Dkt. 1) at ¶¶ 23, 26, 63, 65, 67, 84)), are legal conclusions that the Court need not, and does not, accept as true at the 12(b)(6) stage. *See Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) ("allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion"). More importantly, the complaint does not plausibly allege that each Defendant committed the requisite *two* predicate acts, rendering the existence of a pattern of activity overly speculative. According to the complaint, the predicate act is a violation of 18 U.S.C. § 1954 that Defendants committed when they tricked retirement plans into implementing, and investors into using, GoalMaker and then received non-*bona fide* payments after GoalMaker was used and fees were assessed on the basis of GoalMaker's recommendations. *See generally* (Dkt. 1) at ¶¶ 47–62. Notwithstanding whether Green's allegations actually state a violation of § 1954, by Green's

18

own admission, he has only pled one predicate act. *See, e.g.*, (Dkt. 44) at 7–8 (arguing that he properly alleged "the commission of a RICO 'predicate act' here); *accord* (Dkt. 53) at 6–7. And through the associated allegations, the complaint only alleges that *Green* has used GoalMaker in the past and that his account was invested in all seven high-cost, revenue-sharing funds available in the Rollins Plan. Although the complaint refers to a § 1954 violation "through each instance of the implementation of the GoalMaker program for the Rollins Plan and the other Plans," *id*. at ¶ 55(b), "a plaintiff's conclusory allegations that 'defendants' also defrauded unidentified 'others' are not enough to plead the requisite pattern." *Goren*, 156 F.3d at 729. Even outside of the application of Rule 9(b), the complaint fails to set forth factual allegations sufficient to plead a pattern of racketeering activity through two or more related and continuous predicate acts.

Again, Green points to *Ironworkers* to argue that this element is sufficiently alleged. And again, that case is distinguishable this time for the obvious fact that the complaint in *Ironworkers* not only alleged violations of two statutory sections—§ 1954 and § 664, *Ironworkers*, 2005 WL 711977, at *6–*7—it also complained about an exact amount of fees and commissions taken on account of three individually identified contracts over a specified amount of time. *See Bd. of Trustees of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*, No. 04 C 821 (Dkt. 1) (N.D. Ill. filed Feb. 2, 2004). The complaint here, in addition to only alleging one statutory violation, comes nowhere close to containing even this level of basic detail about the predicate act alleged.

As a final point, the complaint, in large part, treats all of the Defendants collectively as one and it frequently fails to differentiate between PRIAC and PIMS. Such "lumping together" of defendants is not sufficient to state a RICO claim under § 1962(c), particularly under this

element which requires allegations sufficient to demonstrate that each RICO Defendant engaged in at least two predicate acts. *See Goren*, 156 F.3d at 730.[3]

## CONCLUSION

For the reasons stated above, Morningstar's (Dkt. 23) and the Prudential Defendants' (Dkt. 38) motions to dismiss are granted.

*[signature]*
Hon, Virginia M. Kendall
United States District Judge

Date: March 16, 2018

---

[3] To the extent that the complaint brings a claim for a violation of § 1962(d) (*see* (Dkt. 1) at ¶¶ 70, 71, 72 ("Defendants' aforementioned concealment of the bad-faith scheme described herein violates 18 U.S.C. § 1962(d).")), that claim similarly fails. Pursuant to § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Therefore, in addition to the four requirements of § 1962(c), subsection (d) requires "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823 (7th Cir. 2016) (internal citation omitted). As discussed above, Green has not sufficiently alleged the existence of an enterprise and he therefore has failed to state a valid claim pursuant to § 1962(d).