## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL D. GREEN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>MORNINGSTAR INVESTMENT MANAGEMENT LLC, PRUDENTIAL INVESTMENT MANAGEMENT SERVICES LLC, AND PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY,<br><br>    Defendants. | Civil Action No. 1:17-cv-05652<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff Michael D. Green ("Plaintiff") brings this action on behalf of himself and all other similarly situated retirement plan investors nationwide against Defendants Prudential Investment Management Services LLC ("PIMS"), Prudential Retirement Insurance and Annuity Company ("PRIAC") (collectively, "the Prudential Defendants"), and Morningstar Investment Management LLC ("Morningstar").

### NATURE OF THE ACTION

2.      Plaintiff is an employee of Rollins, Inc.  He is a participant in the Rollins retirement plan ("the Rollins Plan"). The Rollins Plan is a defined contribution 401(k) retirement plan with assets of roughly $500 million and more than 10,000 participants and beneficiaries.  Defendants are investment-related technology vendors, investment consultants, retirement plan recordkeepers and investment managers with respect to the Rollins Plan and other 401(k) retirement plans across the country. Defendants supplied Plaintiff, the Rollins Plan and other retirement plans (together

with the Rollins Plan, the "Plans") with a plan participant-level automated investment advice program under the tradename GoalMaker. GoalMaker is the fulcrum of Defendants' racketeering enterprise (the "Enterprise").

3. Plaintiff and the other participants in the Plans used and were injured by this innocuous-sounding "investment advice" program. Defendants' so-called "investment advice" program had Plaintiff and other retirement plan investors turn over the investment management of their retirement plan accounts to Defendants.

4. Defendants built GoalMaker together, operate it together and marketed it as a "paradigm change" in retirement plan investing. (*See*, *e.g.*, http://www.osc.ct.gov/benefits/docs/prudentialtransition.pdf ("GoalMaker was developed by Morningstar Associates, LLC and is offered at no cost.") (last viewed March 9, 2017).) But GoalMaker was not some beneficent paradigm change for Plaintiff and the proposed class. Instead, it steered them into high-cost investments that caused Plaintiff and the proposed class to pay unwarranted fees on their retirement investments.

5. As a 401(k) plan, the Rollins Plan allows plan participants like Plaintiff to contribute a portion of their salary and wages on a pre-tax basis in order to save for retirement. It is an "individual account plan" as defined in Section 3(34) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(34), meaning it is "a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account." Rollins, as the employer-sponsor of the Rollins Plan, makes matching contributions to supplement the employees' contributions. The Plans also work this way.

AMENDED CLASS ACTION COMPLAINT
*Green v. Morningstar, Inc., et al.*

6.     The Rollins Plan designates a number of mutual funds and other investments as the Plan's "designated investment alternatives" – currently seventeen separate choices, including a Rollins stock fund – and gives individual Rollins Plan investors the ability to choose how their Plan accounts will be invested by allocating their accounts among those designated investment alternatives.

7.     As recognized by the Employee Benefit Security Administration ("EBSA") of the U.S. Department of Labor ("DOL"), "[g]iven the rise in participation in 401(k) type plans and IRAs, the retirement security of millions of America's workers increasingly depends on their investment decisions. ***Thus, there is increased recognition of the importance of investment advice in helping participants avoid costly investment errors***."[1] (Emphasis added.)

8.     Defendant PRIAC included GoalMaker when it sold recordkeeping and other administrative services to the Rollins Plan, and it likewise has done so to other individual account ERISA-covered retirement plans.

9.     GoalMaker is a computer-based asset allocation program that automatically allocates a retirement plan investor's account among various plan investment options, supposedly based on a given retirement investor's age, income, savings rate and other data. In reality and as alleged herein, it does so based on the goal of advancing the interests of the Enterprise.

10.     GoalMaker "uses Morningstar's technology" to allocate retirement investing assets.

---

[1] EBSA Fact Sheet, "*Final Rule to Increase Workers' Access to High Quality Investment Advice,*" Oct. 2011, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-rule-to-increase-workers-access-to-high-quality-investment-advice.pdf (last viewed April 10, 2018) (emphasis added).

(*See*    https://www.alexandriava.gov/uploadedFiles/finance/info/pension/Minutes20120627.pdf (last viewed on May 3, 2017).)

11.     In furtherance of the instant racketeering activity, the computer software underlying GoalMaker was modified by Morningstar and/or one or more of the Prudential Defendants for use by Plaintiff and the Prudential Defendants' other retirement plan customers.   A Prudential presentation promoting the GoalMaker program states that "Morningstar Associates is a registered investment advisor and wholly owned subsidiary of Morningstar, Inc. *Morningstar Associates provides consulting services to Prudential with respect to the GoalMaker model portfolios* and in no way acts as an investment advisor to investors of Prudential's products or services. *The GoalMaker model portfolio allocations were developed by Morningstar Associates within a set of guidelines determined by Prudential.*"[2]

12.     The Prudential Defendants and Morningstar, through "consulting" meetings and joint GoalMaker-related asset allocation computer modeling work, worked together to configure GoalMaker to generate what are known as revenue sharing fees for the Prudential Defendants by covertly limiting the retirement investment choices otherwise available to Plaintiff and other investors in the Plans.

13.     Defendants influenced the Plans and their investors here to use GoalMaker by giving GoalMaker away to the Plans ostensibly for free.

14.     Prudential tells Plan investors that "GoalMaker is an optional asset-allocation service that you can use to automatically diversify your investments among the [] investment

---

[2] *See, "The 'How Do I Choose My Investment' Challenge,"* dated April 5, 2012, available at http://docplayer.net/14950775-Optional-asset-allocation-program-for-participants.html         (last viewed March 3, 2017) (emphasis added).

options that are in your plan[.]" Jim Mallozzi, Senior Vice President at PRIAC, stated that GoalMaker "offers unbiased asset allocation modeling during the accumulation and distribution phases of retirement planning[.]"

(*See* http://www.businesswire.com/news/home/20070711005990/en/Prudential-Creates-Unique-Retirement-Option-Powered-Morningstar (adding that GoalMaker "simplifies investment decision-making through unbiased asset allocation modeling, and it provides participants with an extremely flexible, automatic answer to generating income using their fund assets at retirement") (last viewed January 29, 2017).)

15.    GoalMaker, however, is not "unbiased." In fact, GoalMaker sent money from Plaintiff and the proposed class to Defendants here by being very biased – that is, by using automated technology to steer Plaintiff and the Plans into investing in retirement funds that paid revenue sharing fees to the Prudential Defendants.

16.    Defendants did this by having retirement plans that used GoalMaker restrict the number and identity of the investment options that would be included in the GoalMaker asset allocation. Defendants marketed GoalMaker to the Plans and to retirement plan participants like Plaintiff. Defendant PIMS, for instance, handles GoalMaker advertising to retirement investor groups, stating in one such advertisement that "[n]ow may be a good time to revisit your asset allocation strategy by . . . using GoalMaker." And PIMS says in the same advertisement that retirement investing doesn't have to be difficult – "[a]nd with GoalMaker's help, it isn't." (*See* http://www.retire.prudential.com/media/managed/iratoolkit.pdf (last viewed March 31. 2017).) Likewise, PIMS marketed GoalMaker to large hospital retirement plans by saying it was "[a] simple solution that helps employees utilize professionally designed portfolios that rebalance over time." (*See* http://healthcare.prudentialretirement.com/fact-sheet.php (last viewed January 29,

2017).) PIMS also says that, as concerns GoalMaker and related services, "GoalMaker's model allocations are based on generally accepted financial theories that take into account the historic returns of different asset classes." (*Id.*)

17.    The GoalMaker-related fees that Defendants took from Plaintiffs and that are at issue here were not bona fide, good faith fees for work actually performed by Defendants, as explained further below.

18.    The fees in question are known in the retirement investing industry as revenue sharing fees. One retirement investing report concisely describes them:

> Revenue sharing is the practice of adding additional non-investment related fees to the expense ratio of a mutual fund. These additional fees are then paid out to various service providers – usually unrelated to the fund company managing the fund. Why is this controversial? Mutual fund returns are reported net of fees, so the money collected from investors and paid out to other parties is not explicitly reported to investors, it simply reduces the net investment return of the fund. Because investors don't see the fees being deducted, the true cost of the fees charged is often overlooked when calculating the total cost of plan services.

(*See* https://www.employeefiduciary.com/blog/revenue-sharing-is-on-the-decline-in-401k-plans (last viewed on April 6, 2018).)

19.    Plaintiff and the proposed class would have paid lower fees in connection with their retirement plan investments had the Enterprise not used GoalMaker to steer them into retirement plan investments that kicked revenue sharing fees back to the Prudential Defendants.

20.    When a retirement investor like Plaintiff uses GoalMaker to manage the investment of his or her retirement plan account, he or she effectively cedes to Defendants the authority to direct the investment of that account. As described by the North Carolina Department of State Treasurer with respect to the GoalMaker investment options provided to participants of certain retirement plans for North Carolina state employees, the GoalMaker Model Allocations

are a modified version of ***an off-the-shelf asset allocation model from Morningstar. Morningstar provides their services to Prudential Retirement, as the plan recordkeeper, and the allocations are presented to the participants through Prudential's GoalMaker® service offering as GoalMaker® Funds***. The recordkeeper [which is one or more of the Prudential defendants here, in many if not all cases Defendant PRIAC] automatically allocates any contributions and distributions across the investment options in the model, in order to maintain the targeted Model Allocation. The recordkeeper rebalances the allocation across the investment options back to the target allocation on a quarterly basis.

(*See* https://www.nctreasurer.com/ret/Board%20of%20Trustees/Glidepath%20Project %20Update%20Tab%203.pdf (last viewed on March 9, 2017) (emphasis added).)

21.     So when Plaintiff and the Plans used GoalMaker, GoalMaker did not take into consideration each plan's entire menu of designated investment alternatives.

22.     For example, with respect to the Rollins Plan, of the sixteen designated investment alternatives (not including the Rollins Stock Fund) offered by the Rollins Plan, only seven are utilized by the GoalMaker program**.** This is because of the operation of GoalMaker itself and not because of any independent actions of Rollins as the Plaintiff's retirement plan sponsor here in adopting GoalMaker for the plan's use and/or because of any actions of Plaintiff himself with regard to his investment decisions. Indeed, GoalMaker automatically made Plaintiff's instant investment decisions for him based on what was in Defendants' financial interests.

23.     Again, if Defendants had not worked together to build GoalMaker and sell it to retirement plans like Plaintiff's, Plaintiff would not have paid the fees complained of here. A few examples follow.

24.     First, as concerns the Rollins Plan, for the so-called mid cap equity asset class, GoalMaker includes the Goldman Sachs Mid Cap Value Fund, class A shares, with a total expense ratio of 1.16%. But it excludes the generally comparable but much less expensive Vanguard Mid Cap Index Fund Admiral share class, which has a total expense ratio of only 0.08%. The Vanguard fund pays no revenue sharing kickbacks to PRIAC, whereas the Goldman Sachs fund makes

revenue sharing payments to PRIAC in the amount of 25-40 basis points of the investment in the fund.

25.     As another example, for the international equity asset class in the Rollins Plan, GoalMaker includes only the American Funds EuroPacific Growth Fund, R4 share class, with a total expense ratio of 0.85%, but excludes the generally comparable Vanguard Total International Stock Fund Admiral shares with a total expense ratio of only 0.12%.  PRIAC receives revenue sharing of at least 25 basis points of the amount invested in the EuroPacific Growth Fund, compared to no revenue sharing from the Vanguard fund.

26.     Defendants' racketeering enterprise stands in sharp relief when one considers the design and operation of nearly all other similar automated advice programs that qualify to operate within an ERISA-covered retirement plan like the Rollins Plan.  As it turns out, Morningstar has designed and maintains a basic computer-based asset allocation model that can allocate a retirement plan investor's account among various investment choices available in the investor's retirement plan.  That program is designed to take into account **_all_** of the investment choices available in a given retirement plan (other than asset-allocation funds like target date funds[3] and employer stock funds).  And, in fact, this very Morningstar program serves as the foundation for non-GoalMaker automated investment advice products offered by Merrill Lynch and SunAmerica in addition to a separate (which is to say, non-GoalMaker ) automated advice product offered by Morningstar itself.

---

[3] Target date funds are constantly adjusting the asset allocation of the fund over time, so if a program like GoalMaker included target date funds in the allocation program, it would never be able to achieve its intended asset allocation because the allocation in the target date fund is constantly changing.

27.     Defendants through the Enterprise thus intentionally and systematically influenced retirement investors in the Plans to invest in high-fee investment options through the GoalMaker program. They did so in order to advance the goals of the Enterprise, which are described more fully below. The Enterprise's development, maintenance, marketing and use of GoalMaker violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*    Defendants committed the RICO acts alleged herein willfully and/or with actual knowledge of the activities in question.

28.     The pattern of related and continuous RICO-covered acts in question extended over a substantial period of time, continues through the present and proximately caused Plaintiff and the proposed class here injury to their money and property as described with more particularity below.  The Enterprise began no later than 2012, when according to documents Morningstar has offered to the Court [Dkt. 68 at ¶ 10], Morningstar began working with PRIAC to develop GoalMaker to steer retirement investors like Plaintiff into investment funds that pay disguised fees to PRIAC, and it is continuing.

29.     Even if – and Plaintiff does not concede this is so – one or more Defendants disclosed details about GoalMaker's fund selection mechanism to one or more members of the class and/or their retirement plan sponsors (such as Rollins, for instance), and even if one or more of those plan sponsors (arguendo) was ultimately responsible for the use of GoalMaker here, neither fact would relieve Defendants of liability.  First, the Enterprise here has open-ended continuity; that is, it involves past conduct that by its nature projects into the future with a threat of repetition.  Second, any disclosure and/or act of a retirement plan sponsor to embrace GoalMaker does not sever the chain of RICO causation so as to warrant judgment in Defendants' favor – either now or later.  It merely demonstrates the potential liability of two different parties:

AMENDED CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

the liability of Defendants for engaging in unlawful conduct under RICO and the potential liability of an instant plan sponsor under ERISA for failing to discover it. *See, e.g., BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011) (in RICO case observing that "[t]he defendants argue that if there is any possible slip 'twixt cup and lips (to continue law by proverb), the plaintiff must prove that it did not occur. Not so. The plaintiff doesn't have to prove a series of negatives; he doesn't have to "'offer evidence which positively exclude[s] every other possible cause of the accident.' " . . . . Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation") (citation omitted).

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962 and 1964 and 28 U.S.C. §§1331, 1332 and 1367.

31.     Venue lies in this District because the Defendant Morningstar resides and can be found and has agents and/or transacts its affairs here.

## THE PARTIES

32.     Plaintiff Matthew D. Green ("Plaintiff") is a resident of South Carolina and a participant in the Rollins Plan.

33.     Plaintiff invested in retirement investment funds that paid revenue sharing fees PRIAC through the Rollins Plan and GoalMaker following the inception of the Enterprise and during the class period.

34.     Defendant Prudential Investment Management Services LLC ("PIMS"), a subsidiary of Prudential Financial, Inc. ("PFI"), is "a registered broker-dealer[] . . . [that] supports a diverse array of businesses *throughout the Prudential Financial, Inc. . . . enterprise*." PIMS

is, for example, "a distributor of mutual funds and group variable annuity products, an introducing broker for retirement plans, a clearing broker for certain mutual fund platforms, and a full-service broker. Its registered representatives' offer, primarily through third parties and/or to institutions, a variety of securities products, including mutual funds, separately managed accounts, retirement plan securities, limited partnerships, and more. [PIMS] ha[s] offices and operations throughout the United States, but are primarily located in the Northeast[.]" (*See* http://www.prudential.com/media/managed/PIMSBCPCustomerDisclosureFinalv2.pdf (last viewed January 25, 2017) (emphasis added).) As described above, PIMS plays an integral role in marketing GoalMaker to retirement investors for the Prudential family of companies.

35.    Defendant Prudential Retirement Insurance and Annuity Company ("PRIAC") is, like PIMS, a subsidiary of PFI. It is an insurance company with its principal place of business in Hartford, Connecticut. PRIAC is self-described as a "Prudential Financial" company, with Prudential Financial being a service mark of The Prudential Insurance Company of America and its affiliates. PRIAC provides recordkeeping and other administrative services, including the GoalMaker program, to the Rollins Plan and the other Plans.

36.    Defendant Morningstar Investment Management LLC is a registered investment advisory firm headquartered in Chicago, Illinois.

## DEFENDANTS' MISCONDUCT

37.    The Rollins Plan is an "employee benefit pension plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

38.    The Rollins Plan covers all employees of Rollins and its subsidiaries that participate in the Rollins Plan.

39.     According to U.S. Department of Labor Form 5500 filed by Rollins, the Rollins Plan had more than 10,000 participants as of the end of the 2015 plan year, including active participants, retired or separated participants receiving benefits or entitled to future benefits, and deceased participants whose beneficiaries are receiving or entitled to receive benefits.  The Rollins Plan held around $500 million in assets at the end of the 2015 plan year.

40.     At all times material hereto, the Rollins Plan used the GoalMaker asset allocation service to have Plaintiff and other retirement investors "automatically diversify your investments among the following investment options that are in your plan:

- American Funds EuroPacific Growth R4

- Franklin Growth Adv

- Goldman Sachs Mid Cap Value A

- Metropolitan West Total Return Bond Fund

- T. Rowe Price New Horizons

- Vanguard Windsor II Admiral

- Prudential Guaranteed Fund." [4]

41.     Although there are sixteen investment choices available in the Rollins Plan (plus Rollins company stock), GoalMaker utilized for Plaintiff here only seven of those sixteen choices, including the most expensive investment choices and entirely excluding the least expensive choices, which are Vanguard index funds.

42.     For example, GoalMaker allocates Rollins Plan participant accounts and other Plan investor accounts to the Goldman Sachs Mid Cap Value Fund, class A shares.  These are Investor

---

[4] "The Rollins 401(K) Savings Plan Overview of Plan Investment Options and Fees," dated as of June 30, 2016 (the "Rollins Plan Fee Disclosure"), attached as Exhibit A to this Complaint.

class shares. Class A shares have an expense ratio of 1.16%, 40 basis points more than the Goldman Sachs Mid Cap Value Institutional class shares, and pay PRIAC at 25-40 basis points in revenue sharing fees. But, instead, GoalMaker could have used the available Vanguard Mid Cap Index Admiral Fund, which has an expense ratio of only 8 basis points (rather than 116) and pays no revenue sharing to PRIAC.

43.     As another example, GoalMaker for its Rollins Plan asset allocations – Plaintiff's among them – includes the American Fund EuroPacific Growth, R4 share class, with a total expense ratio of 85 basis points, and pays Prudential at least 25 basis points in revenue sharing fees. Again, the Rollins Plan could have instead acquired the EuroPacific Growth R6 share class, which has a total expense ratio of only 50 basis points and pays no revenue sharing, saving Plaintiff and other affected Rollins Plan investors a total of 35 basis points in fees. Or GoalMaker could have included the available Vanguard Total International Stock Index Fund, which charges an expense ratio of only 12 basis points, and thus provided an investment similar to the EuroPacific Growth Fund but with an expense ratio that is 85% less, or perhaps the large cap international equity fund selected by Morningstar for its asset allocation models. But it did not do any of these things, of course, in order to increase its revenue sharing fees.

44.     GoalMaker for Rollins also includes the Advisor share class for the Franklin Growth Fund, which has an expense ratio that is 17 basis points higher than the available R6 share class, and the T. Rowe Price New Horizons Fund, a small cap stock fund, which has an expense ratio of 79 basis points, whereas the available institutional ("I") class share charges 14 basis points less than the Investor share class included in the Plan. The Vanguard Small Cap Index Fund, which is similar to the New Horizons Fund, is an available investment choice in the Plan with an expense ratio of only eight basis points.

45.     The following table illustrates the additional fees obtained by the Prudential Defendants for the 2015 plan year as a result of GoalMaker's intentionally rigged selection of high cost funds for investors in the Rollins Plan, including Plaintiff.  The funds highlighted in blue are the funds actually used by GoalMaker, and the funds listed below the highlighted funds are either other funds of the same asset class available as investment alternatives in the Rollins Plan or different share classes of the same fund that were available to the Rollins Plan.  The table also shows the additional fees paid by Rollins Plan participants over the fees they would have paid had GoalMaker included the alternative funds.

| Calculation of Excess Compensation Received by Prudential and Excess Fees Paid By Participants As a Result of Rigged Fund Selection | | | | | | |
|---|---|---|---|---|---|---|
| Funds selected by Prudential included in GoalMaker | Alternative fund | Value at 12/31/2015 | Expense Ratio | Revenue Share | Excess Revenue to Pru over Alternative fund | Excess fee paid by participants |
| METROPOLITAN WEST TOTAL R | | $ 27,753,008.00 | 0.40% | 0.00% | $0.00 | $ 94,360.23 |
| | Vanguard Total Bond Index | $ 27,753,008.00 | 0.06% | 0.00% | $0.00 | $ - |
| Franklin Growth Advisor | | $ 51,230,598.00 | 0.63% | 0.14% | $71,722.84 | $ 281,768.29 |
| | Franklin Growth R6 | $ 51,230,598.00 | 0.49% | 0.00% | $0.00 | $ 210,045.45 |
| | Vanguard Growth Index | $ 51,230,598.00 | 0.08% | 0.00% | $0.00 | $ - |
| Goldman Sachs Mid Cap Val Fund A | | $ 15,206,779.00 | 1.15% | 0.40% | $60,827.12 | $ 162,712.54 |
| | Vanguard Mid Cap Index Adm | $ 15,206,779.00 | 0.080% | 0.00% | $0.00 | $ - |
| T Rowe Price New Horizons Fund Advisor | | $ 18,087,909.00 | 0.79% | 0.14% | $25,323.07 | $ 132,041.74 |
| | T Rowe Price New Horizons Fund Institutional | $ 18,087,909.00 | 0.65% | 0.00% | $0.00 | $ 106,718.66 |
| | Vanguard Small Cap Index Adm | $ 18,087,909.00 | 0.060% | 0.00% | $0 | $ - |
| American Funds EuroPac Gr R4 | | $ 29,804,400.00 | 0.85% | 0.35% | $104,315.40 | $ 217,572.12 |
| | American Funds EuroPac Gr R6 | $ 29,804,400.00 | 0.5% | 0.00% | $0.00 | $ 113,256.72 |

AMENDED CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

| | Vanguard Total Intl Stock Index | $ 29,804,400.00 | 0.12% | 0.00% | $ - | $ - |
|---|---|---|---|---|---|---|

The Rollins investment choices selected for inclusion in GoalMaker, which carry substantially higher fees than available alternative investments, were as a matter of fact chosen by the Enterprise (via GoalMaker) ostensibly on Plaintiff's behalf for the purpose of sending revenue sharing fees to the Prudential Defendants. This completely belies the assertion of Prudential that GoalMaker is provided at no cost and also shows that the revenue sharing fees at issue in this case were at no time "bona fide" payments for services rendered. In contrast, the revenue sharing fees of the sort the Enterprise harvested here are quite the opposite: in a word, pure profiteering – which comes at the cost of retirement investors such as Plaintiff and the proposed class. (*See* citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.363.9371&rep=rep1&type=pdf (research paper from 2007 Journal of Business Ethics showing statistically how mutual fund "sales loads" are "a deadweight cost that reduces the returns earned by the investor") (last viewed April 6, 2018); *see also* https://www.sec.gov/investment/im-guidance-2016-01.pdf (SEC bulletin characterizing mutual fund revenue sharing fees as "asset-based sales loads") (last viewed April 10, 2018).)

## RACKETEERING ALLEGATIONS

*The Enterprise*

46.     The Prudential Defendants and their affiliates and agents are "persons" within the meaning of 18 U.S.C. §1961(3).

47.     Based upon Plaintiff's current knowledge, the following persons constitute a group of persons and entities associated-in-fact, hereinafter referred to in this Complaint as the "Enterprise":

a.      Defendant PIMS,

      b.      Defendant PRIAC and

      c.      Defendant Morningstar.

48.     The Enterprise is an ongoing organization that provides automated retirement investment advice services to hundreds of qualified retirement plans across the country. The Enterprise engages the production of goods and/or services in and affects interstate commerce by marketing GoalMaker to retirement plans.

49.     At all times a common purpose existed among Defendants in the Enterprise. From the inception of the Enterprise to date, Defendants worked together to achieve the common purpose of obtaining a leading position in the market for retirement plan automated investment advice services through an elaborate scheme to: (1) influence retirement plans and retirement plan investors like Plaintiff, (2) cause them to choose high-cost retirement funds and (3) thereby enrich Defendants with revenue sharing fees and intangible assets.

50.     The automated retirement plan investment advice market niche was at the inception of the Enterprise and is today highly lucrative and much-coveted among investment providers like Defendants. (*See* https://www.financial-planning.com/news/robos-eye-big-prize-500b-advisor-market (last viewed March 27, 2018).) As in the *Ironworkers* case,[5] Defendants here share a common purpose of conducting a volume of business in the automated investment advice services market with one another.

51.     Morningstar has profited from the Enterprise beyond what would have happened had there been no Enterprise and Morningstar had simply gone about its own business. As a result of participating in the Enterprise, Morningstar received and continues to receive commissions in

---

[5]   *See Bd. of Trustees of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*, No. 04 C 821, 2005 WL 711977, at *3 (N.D. Ill. March 28, 2005). The *Ironworkers* complaint is attached for referenced as Exhibit B to this Complaint.

the form of GoalMaker-related development fees and consulting fees. But for the Enterprise and but for the revenue sharing fee mother lode it created for Prudential, Prudential would not have developed and/or deployed GoalMaker as widely it did (as alleged herein), and thus some or all of the aforementioned payments to Morningstar would not exist. Morningstar, moreover, has also through the Enterprise obtained economically valuable business goodwill and other intangible assets flowing from being the widely publicized architect of this putative "paradigm change" in retirement investing, which is known in the clubby world of retirement plan finance to be a fee-generating machine for the Prudential companies. This business goodwill and these intangible assets are as real as cash payments. Morningstar's corporate records indicate that Morningstar obtained these benefits following GoalMaker's widespread introduction to retirement plan financial services customers like Plaintiff. (*See,* *e.g.,* http://www.morningstar.com/InvGlossary/goodwill_definition_what_is.aspx (last viewed March 27, 2018); *see also* https://corporate.morningstar.com/us/documents/PR/Morningstar-Annual-Report-2015.pdf (last viewed March 27, 2018).) For instance, the 2015 Morningstar annual financial report lists among Morningstar's "Goodwill" and "Intangible Assets" the following: "Customer-related assets," "Supplier relationships," "Technology-based assets" and "other Goodwill" in the hundreds of millions of dollars collectively. These intangible assets in 2015 and/or in other accounting years of the proposed class period upon information and belief include economic benefits Morningstar realized from the Enterprise. Again, these are economic benefits separate from and beyond customary software design and consulting fees that Morningstar would otherwise acquire in the course of technical work on an automated investment software product like GoalMaker. Morningstar would not have obtained these benefits had it not participated in the Enterprise as it did.

52. Morningstar's campaign to secure a dominant position in the lucrative automated retirement plan investment advice market through the conduct of the Enterprise – which, as described here, has disguised profiteering at the expense of business counterparties as its hallmark – has gone well "outside of its commercial bounds," as the Court put it [Dkt. 68 at ¶ 15], and even beyond the GoalMaker product itself. To wit, Morningstar in 2014 settled for $61 million a lawsuit alleging that Morningstar from 2007 to 2010 pilfered valuable automated retirement plan investment advice software from one of its business partners and grafted it on to Morningstar's own automated retirement plan investment advice technology (which includes but is not limited to GoalMaker technology) in order to strengthen its position in this lucrative market segment. (*See* http://www.investmentnews.com/article/20140718/FREE/140719909/morningstar-to-pay-61-million-in-trade-secrets-settlement (last viewed March 27, 2018).) Morningstar engaged in this alleged conduct in furtherance of its Enterprise goals. Again, this goes beyond Morningstar simply acting to retain its business relationship with Prudential. To the contrary: it (as alleged) is classic racketeering conduct, which Morningstar committed in the automated retirement plan investment advice market segment. These alleged events underscore a pattern of Morningstar converting and abstracting to its own use the property of others in order to, as the Court put it, procure unlawful payments from the retirement fund investing business.

53. While all this was happening, PRIAC received and today continues to receive revenue sharing payments via GoalMaker's investment referrals. PIMS shares in these payments through the Prudential corporate form. So Defendants all shared the profits from the Enterprise, albeit not through a common accounting facility.[6] And they earned these profits by pursuing the

---

[6] *See also Menzies v. Seyfarth Shaw LLP,* 1:15-cv-03403, 2016 U.S. Dist. LEXIS 92765, at *27-28 (N.D. Ill. July 15, 2016) ("Indeed, Defendants here misread *Guaranteed Rate* to argue that

affairs of the Enterprise, not simply their own affairs independently in the manner of "business as usual." In this respect, this case contrasts sharply with *Walgreen*.[7] For unlike *Walgreen*, Plaintiff here has identified separate and distinct goals of the Enterprise – namely, enabling Defendants each to obtain leading positions in the market for retirement plan automated investment advice services – that go beyond the alleged predicate acts of overbilling (as that term is used in *Walgreen*).

### *The Predicate Acts*

54.     The RICO predicate acts in this case are codified at 18 U.S.C. § 664 and 18 U.S.C. § 1954.

55.     As the plaintiffs did in *Ironworkers*, Plaintiff here alleges that **each and every time** during the proposed class period that a revenue sharing payment was made by a member of the proposed class[8] to PRIAC as a result of the scheme complained of here, RICO Section 1954 and

---

RICO requires the enterprise members to share the profits of their illegal scheme. There is no such requirement. Although sharing profits (or otherwise comingling illicit proceeds) might show a 'common purpose' under RICO, the law after *Boyle* is clear that such allegations are merely relevant and possibly sufficient--but in no event necessary--for liability. This Court rejects Defendants' efforts to extend *Guaranteed Rate*, and declines to create a new and unfounded 'profit-sharing' test for establishing membership within a RICO enterprise. . . . In determining whether a defendant is a member of the enterprise, or merely an outside 'hireling' earning a 'normal' fee, the existence or absence of profit-sharing is a relevant factor, but it is neither required nor dispositive in the analysis. *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (observing that the 'operation' of an enterprise includes 'foot soldiers' as well as 'generals' and can even include a participant's acquiescence to **losing** money to advance the enterprise's goals)[.]").

[7] *United Food & Comm'l Workers Union & Emp'rs Midwest Health Ben. Fund v. Walgreen Co.*, No. 12 C 204, 2012 WL 3061859, at *5 (N.D. Ill. July 26, 2012) (dismissing RICO claims when defendants were each conducting their own affairs, and the plaintiffs failed to identify separate goals for the alleged enterprise beyond the predicate acts of overbilling).

[8] All of whom per the proposed class definition here have been subjected to GoalMaker, which, again, was jointly developed and is jointly maintained by all of the Defendants in this matter.

664 predicate acts were committed.  Each and every time an unlawful deduction of money (via GoalMaker and the revenue sharing device) from the retirement fund assets of Plaintiff and the proposed class occurred as alleged here, a violation of Section 664 occurred that caused a separate, identifiable injury to the retirement funds owned by Plaintiff and the proposed class. Each of these deductions of money via GoalMaker and revenue sharing from Plaintiff and the proposed class's retirement funds was a fee, kickback, commission, gift, loan, money and/or other thing of value within the meaning of Section 1954.  Therefore, literally thousands of instances of Defendants' violation of Section 664 and Section 1954 are before the Court here – vastly in excess of the two or more related and continuous predicate acts required by the RICO statute.

56.     Section 664 provides that:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

*Id.*  Section 664 clarifies that "employee welfare benefit plan" means a plan covered by ERISA. The Rollins Plan and the Plans are covered by ERISA.

57.     The United States Supreme Court has precisely defined what "abstracts . . . to his own use or to the use of another" means.  In a hoary old decision, the Court stated:

> It is true that the word "abstract," as used in this statute, is not a word of settled technical meaning like the word "embezzle," as used in statutes defining the offense of embezzlement, and the words "steal, take, and carry away," as used to define the offense of larceny at common law. ***It is a word, however, of simple, popular meaning, without ambiguity. It means to take or withdraw from***; so that to abstract the funds of the bank, or a portion of them, is to take and withdraw from the possession and control of the bank the moneys and funds alleged to be so abstracted. This, of course, does not embrace every element of that which, under this section of the statute, is made the offense of criminally abstracting the funds of the bank. ***To constitute that offense, within the meaning of the act, it is necessary that the moneys and funds should be abstracted from the bank without its knowledge and consent, with the intent to injure or defraud it, or some other company or person, or to deceive some officer of the association, or an agent appointed to examine its affairs***.

*United States v. Northway*, 120 U.S. 327, 334 (1887).  Courts today follow the definition of

"abstract" in *Northway*. *See, e.g., United States v. Duff*, 529 F.Supp. 148, 152 (N.D. Ill. 1981) (denying motion to dismiss embezzlement claim and discussing "abstract" language in *Northway*); *United States v. Nolan*, 136 F.3d 265, 270 (2d Cir. 1998) (affirming conviction of embezzlement under Section 664 and discussing "abstract" language in statute and following *Northway*); *Colella v. United States*, 360 F.2d 792, 803 (1st Cir. 1966) (following *Northway*).

58.    Defendants violated Section 664 as described herein. Defendants unlawfully and willfully abstracted to their own use or the use of another moneys, funds and/or other assets of Plaintiff and other investors in the Plans (who comprise the proposed class here) through the Enterprise. Specifically, through GoalMaker's harvesting of hidden revenue-sharing fees from the retirement investments of Plaintiff and the proposed class, Defendants took or withdrew money from Plaintiff and the proposed class without their full knowledge and consent and/or with intent to injure them directly and/or through their agents (here, their retirement plans and/or plan sponsors). Defendants did this continuously over a period of years through the Enterprise. When Defendants did this, they could not have believed in good faith that their taking of revenue sharing fees from the retirement funds of Plaintiff and the proposed class via GoalMaker would benefit Plaintiff and the proposed class, for, as noted above, revenue sharing fees are a "deadweight cost" to retirement investors.

59.    Another RICO predicate act appears at 18 U.S.C. § 1954, which prohibits "person[s] who provides benefit plan services" to "employee pension benefit plans" from "receiv[ing] or agree[ing] to receive or solicit[ing] any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan[.] " *See also United States v. Romano*, 684 F.2d 1057, 1063–64 (2d Cir.), cert. denied, 459 U.S. 1016, 103

S.Ct. 375, 376, 74 L.Ed.2d 509 (1982).

60.     Altogether, 18 U.S.C. § 1954 provides that:

Whoever being –

(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or

(2) an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan; or

(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or

(4) *a person who*, or an officer, counsel, agent, or employee of an organization which, *provides benefit plan services to such plan*

***receives or agrees to receive or solicits any fee, kickback, commission***, gift, loan, money, ***or thing of value because of or with intent to be influenced with respect to, any of the actions***, decisions, or other duties relating to any question or matter ***concerning such plan*** or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both: ***Provided, That this section shall not prohibit the payment to or acceptance by any person of bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of his duties as such person***, administrator, officer, trustee, custodian, counsel, agent, or employee of such plan, employer, employee organization, or organization providing benefit plan services to such plan. As used in this section, the term (a) "any employee welfare benefit plan" or "employee pension benefit plan" means any employee welfare benefit plan or employee pension benefit plan, respectively, subject to any provision of title I of the Employee Retirement Income Security Act of 1974, and (b) "employee organization" and "administrator" as defined respectively in sections 3(4) and (3)(16) of the Employee Retirement Income Security Act of 1974.

*Id* (emphasis added).

61.     Section 1954, then, makes it unlawful for a person to receive or solicit "any fee, kickback, commission, gift, loan, money or thing of value" apart from bona fide compensation or payments in connection with that person's actions or duties regarding an employee pension plan. *Id.*; *see also, United States v. Romano,* 684 F.2d 1057, 1063–64 (2d Cir.), *cert. denied,* 459

U.S. 1016, 103 S.Ct. 375, 376, 74 L.Ed.2d 509 (1982). Defendants received those things here.

62.     And, also under Section 1954, a RICO defendant may be liable for receiving money and/or other things of value in this setting (assuming all other RICO liability elements are satisfied), either:  (a) "because of" any actions or decisions relating to the retirement plan involved (here, the Rollins Plan or any of the other Plans) or (b) "with intent to be influenced with respect to" any Plan.

63.     Section 1954 thus makes it unnecessary that a RICO defendant had the actual ability to control investment decisions of a retirement plan like the Rollins Plan and the other Plans.  *See United States v. Friedland*, 660 F.2d 919, 925-26 (3d Cir.1981) (finding that attorneys who had served as general counsel to a pension plan and whom trustees consulted at meetings and on an ad hoc basis, but who had no actual authority over the plan's investments, were within the ambit of Section 1954). In any event, one or more of the Prudential Defendants had that "actual ability" here.

64.     Morningstar, members of the proposed class here, Rollins and the Prudential Defendants and their affiliates and agents, are all "persons" within the meaning of 18 U.S.C. §1961(3). Under Section 1954, Defendants also are variously "administrator[s], officer[s], trustee[s], custodian[s], counsel[s], agent[s], or employee[s] of any employee welfare benefit plan or employee pension benefit plan" and/or "an officer, counsel, agent, or employee of an employer or an employer any of whose employees are covered by such plan." *Id*.  As detailed below, in the course of providing benefit plan services covered by Section 1954 to Plaintiff, the Rollins Plan and the class, the Defendants themselves, or an officer, counsel, agent, or employee of an organization which provides benefit plan services to such plan on their behalf, conspired to and did in fact violate RICO. The Prudential Defendants and Morningstar are "person[s] who…

provide[s] benefit plan services" to the Plans, including the Rollins Plan, within the meaning of Section 1954.

65.     The revenue sharing payments that the Prudential Defendants received, the development and consulting fees Morningstar received as a result of engineering GoalMaker to steer Plaintiff and class members to the most expensive investment options in the GoalMaker platform were "kickbacks," "money," and/or other "things of value" within the meaning of Section 1954.

66.     Defendants received those payments: (1) "because of . . . the actions, decisions, or other duties relating to any question or matter concerning such plan" within the meaning of RICO, and/or (2) "with intent" for the Rollins Plan and the other Plans "to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan," in particular, in setting up the GoalMaker platform with the intent to route Plan participants into high cost options that would pay unwarranted fees to the Prudential Defendants.

67.     As such, Defendants violated Section  1954:

    a.      by developing, configuring, consulting about and administering GoalMaker for the Rollins Plan and for the other Plans, intending to receive revenue sharing payments  thereby;

    b.      through each instance of the implementation of the GoalMaker program for the Rollins Plan and the other Plans, because of and/or by influencing the selective limitation of investment choices to be utilized by GoalMaker in a manner  designed to maximize revenue sharing kickbacks for the Prudential Defendants; and

    c.      by accepting the instant revenue sharing kickback payments generated as a result of influencing the Plan participants' investments through operation of the

GoalMaker platform.

68.     The revenue sharing payments received by the Prudential Defendants were not at any time under Section 1954 "bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of [Defendants'] duties as such person . . . or organization providing benefit plan services to such plan."

69.     In an apparent effort to hide this from Plaintiff and other Rollins Plan investors, the Rollins Fee Plan fee disclosure suggests participating in the GoalMaker program is free. It also fails to disclose that PRIAC is receiving substantial revenue sharing compensation from the limited number of funds included in the GoalMaker asset allocation program.  Upon information and belief, closely similar or identical fee disclosures were made with respect to the Fee Disclosures for the other Plans.

70.     Likewise, none of the Annual Returns for the Rollins Plan filed on Form 5500 with the Employee Benefits Security Administration ("EBSA") of the U.S. Department of Labor ("DOL") for the past six years provides any information about PRIAC's receipt of indirect compensation, such as revenue sharing, despite the specific requirement of DOL regulations that such information be explicitly disclosed on the Form 5500.

71.     Examination of required disclosures and 5500s for other Plans reveals the same disclosure failure.  For example, the participant fee disclosure for the Autozone Inc. 401(k) Plan, which is also administered by PRIAC and includes GoalMaker, provides no disclosure about the compensation being collected by PRIAC in connection with GoalMaker.  Although the 5500 for the Autozone 401(k) Plan does disclose some revenue sharing received from the Prudential Guaranteed Income Fund and from the Boston Partners Small Cap Value Fund II, there is no

disclosure of the indirect compensation received by PRIAC from American Funds EuroPacific Growth Fund, which pays at least 25 basis points to PRIAC, or from the Delaware Value Fund or the Wells Fargo Small Company Growth Fund.

72.     Because Sections 664 and 1954 use broad language to protect retirement plan beneficiaries from dishonest or unfaithful fiduciaries, they were meant to reach the intentional, bad-faith failure of Defendants here to inform Plaintiff and the other Plan investors and the Plan that they were extracting revenue sharing fees (and the actual amount of those fees) from the placement of their investments through GoalMaker.

### *The Pattern of Racketeering Activity*

73.     Defendants have conducted their Enterprise through a pattern of racketeering activity that has netted the Enterprise millions of dollars in revenue sharing kickback payments from the Rollins Plan and the hundreds of other Plans and millions of dollars in intangible assets as alleged herein. They have done this among other things on what the RICO decisions refer to as a "relationship-plus-continuity" basis between the Morningstar and Prudential entities that are members of the complained-of racketeering enterprise here.

74.     On information and belief, PRIAC employees influenced the sponsors of the Plans to limit the designated investment alternatives that would be considered by the GoalMaker program in order to include a disproportionate number of investment alternatives that had high expense ratios or that were Prudential proprietary investment products, thus increasing the revenue to be received by PRIAC and the other Prudential Defendants to the detriment of the Plans and their investors.

75.     Each of these acts by Defendants had the same purpose – to influence Plan participants to choose the GoalMaker option, which resulted in revenue sharing kickbacks to the

Prudential Defendants. And each had similar results, which were the Prudential Defendants' receipt of the unwarranted fees at issue here, which were paid by Plaintiff and the proposed class. Each had similar participants – Defendants and their Enterprise. Each had similar victims – the Plan participants. Each had the same methods of commission – setting up the GoalMaker platform to route retirement plan participants into the kickback-paying investment options. These acts were interrelated by these distinguished characteristics and were not isolated events, but form an ongoing pattern of misconduct.

76.     The Prudential Defendants have given no indication of halting their receipt of revenue sharing kickbacks from the GoalMaker program or of changing the GoalMaker program so that it directs participants into all of a Plan's designated investment alternatives and not disproportionately into options that provide revenue sharing kickbacks to the Prudential Defendants. Nor have Defendants made any indication that they intend to stop implementing the GoalMaker program for new retirement plan investors going forward. Thus, Defendants' conduct indicates the threat of continuing racketeering activity.

77.     As such, Defendants, through their Enterprise, have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

## RICO VIOLATIONS

78.     Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

79.     Through the pattern of racketeering activity described above, Defendants and their co-conspirators have conducted or participated in the conduct of the affairs of the Enterprise.

AMENDED CLASS ACTION COMPLAINT
*Green v. Morningstar, Inc., et al.*

80.     Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. §1962(d).

81.     Defendants' conspiracy is to increase the revenues and profits they reap from their self-interested administration of GoalMaker and thereby augment their lucrative position as leaders of the automated retirement plan investment advice market segment. They did this through operation of what they in their own words call an "enterprise" by using GoalMaker in connection with retirement plan clients like the Rollins Plan to influence retirement investors like Plaintiff to choose high-cost funds that make unwarranted and bad-faith payments to Defendants here and to abstract the retirement savings of Plaintiff and the proposed class to their own use.  Plaintiff and each member of the proposed class alike have been injured by Defendants' violation of 18 U.S.C. §1962(c) in that Defendants' GoalMaker product selected for Plaintiff and the class retirement investment funds that included revenue sharing fees – which under the circumstances here operated wrongfully to deprive Plaintiff and the class of their retirement monies. These monies – *i.e.*, the amounts taken from Plaintiff and the proposed class's retirement savings by GoalMaker as revenue sharing fees and conveyed to PRIAC for its own use and profit – should have been invested and earning investment income for Plaintiff and the proposed class.  Instead, these monies were actually deducted from their retirement fund assets via revenue sharing and paid by GoalMaker and PRIAC's retirement plan recordkeeping system to PRIAC itself in the first instance and, as alleged *supra*, less directly to PIMS and Morningstar.  And, again, these monies taken wrongfully from Plaintiff and the proposed class by the Enterprise through its racketeering conduct were fees, kickbacks, commissions, gifts, loans, money and/or other things of value within the meaning of Section 1954.  Each unlawful deduction of money from Plaintiff and the proposed class's retirement fund assets and payment from their assets and the Plans to PRIAC and, indirectly, PIMS

and Morningstar – whether as a fee, kickback, commission, gift, loan, money and/or other thing of value within the meaning of Section 1954 – constitutes an individual violation of Sections 664 and 1954 that caused a separate, identifiable injury to the retirement funds of Plaintiff and the proposed class and to Plaintiff and the proposed class themselves.

82.     Defendants' aforementioned concealment of the bad-faith scheme described herein violates 18 U.S.C. §1962(d).

## CLASS ALLEGATIONS

83.     Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All investors that used GoalMaker in Plans covered by 18 U.S.C. § 664 and 18 U.S.C. § 1954 where the funds chosen by GoalMaker pay revenue sharing fees to one or more Defendants.  The class Period is from the earlier of (i) four years before the filing of this action; or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiff and/or the class of the existence of Defendants' breach, the first date on which Defendants included in any or all of the Plans the GoalMaker program, and in either case, through the date of judgment.  The class excludes Defendants and any participant who is a fiduciary to the any of the Plans.

84.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons: The class includes thousands of members and is so large that joinder of all its members is impracticable.

85.     The members of the classes are so numerous as to make joinder impractical.  The Rollins Plan had around 10,000 participants and beneficiaries during the plan year ending on December 31, 2015, and is believed to have had a similar number of participants and beneficiaries in every year of the proposed class Period.  PRIAC serves as recordkeeper and investment provider for more than 500 plans, many of which, on information and belief, utilize the GoalMaker program and are larger than the Rollins Plan.

86.     There are questions of law and fact common to the class, including the following:

a.      What information Defendants provided to Plan sponsors and/or investors with respect to GoalMaker and with respect to the designated investment alternatives included in GoalMaker;

b.      Whether Morningstar was aware that its asset allocation program would be or was being administered by the Prudential Defendants in a manner that included as designated investment alternatives higher-cost investments;

c.      If Morningstar was thus aware, what (if anything) Morningstar did to try to stop it or, alternatively, what Morningstar did to effectuate it;

d.      Whether the selection of those designated investment alternatives for inclusion in the GoalMaker program systematically excluded low-cost investment choices that paid little or no revenue sharing to the Prudential Defendants.

87.     Plaintiff's claims are typical of the claims of the class proposed here.  Defendants' conduct toward Plaintiff is, in its essence, identical to their conduct toward other members of the class and implicates the same set of concerns in both settings. Like members of the class, Plaintiff incurred losses in the form of the payment of excessive and unnecessary fees as a result of the RICO activities alleged herein.  Such excessive and unnecessary fees reduced the value of Plaintiff's and the class's retirement investments.

88.     Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests antagonistic to the interests of the class and is committed to the vigorous representation of the class and prosecution of this case.  Plaintiff has also retained counsel in this case who are experienced in class action, RICO and retirement plan litigation.

89.     Certification under Rule 23(b)(1) is appropriate because the prosecution of separate actions by individual members of the class would create a risk of: (A) inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct for the Defendants opposing the classes, or (B) adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

90.     Certification under Rule 23(b)(2) is also appropriate because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the class.

91.     Certification under Rule 23(b)(3) is appropriate because questions of law and fact common to the members of the class predominate over individual questions and because the prosecution of this action on a class basis is superior to other available methods for the fair and efficient adjudication of this controversy.  In particular:

        a.      The common questions of law and fact identified above are the core issues presented by this action.  The answers to those questions will drive the litigation and resolve the liability issues under the relevant provisions of RICO and applicable case law.  There are no individual issues other than the amount of recovery to which each member of the class will be entitled should Plaintiff prevail, which can be determined by formula and reference to Plan records and Defendants' concerning the investments at issue here by the class.

b.      No member of the class has an interest in individually controlling the prosecution of a separate action, as the claims of all members of the class are the same and certification of the class in this action will require a determination that Plaintiff will adequately represent the interests of all members of the class.  To Plaintiff's knowledge, no separate non-class actions have been filed by any members of the proposed class.

c.      Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

d.      For many of the same reasons described above, a class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the class is impracticable.  The losses suffered by some of the individual members of the class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Even if such actions were viable, the result would be a multiplicity of actions against the same Defendants, involving the same controversy, possibly in multiple jurisdictions.  Individual proceedings would pose the risk of inconsistent adjudications. Plaintiff is unaware of any difficulty in the management of this action as a class action.

### CLAIM FOR RELIEF

**(Violation of 18 U.S.C. §§ 664, 1954 and 1962(c))**
**(All Defendants)**

92.     Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

93.     This claim is brought pursuant to 18 U.S.C. § 1964(c), for violations of 18 U.S.C. § 1962(c), 18 U.S.C. § 664 and 18 U.S.C. §1954.

94.     As set forth above, in violation of 18 U.S.C. § 1962(c), 18 U.S.C. § 664 and 18 U.S.C. §1954, Defendants have conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

95.     Defendants, through their Enterprise, have violated 18 U.S.C. § 664 by repeatedly using the GoalMaker program to abstract to their own use the retirement funds of Plaintiff and the proposed class.  Defendants took or withdrew money from Plaintiff and the proposed class without their full knowledge and consent and/or with intent to injure them directly and/or through their agents.  As Defendants did this, they could not have believed in good faith that their taking of revenue sharing fees from the retirement funds of Plaintiff and the proposed class via GoalMaker would benefit Plaintiff and the proposed class given (among other things) that revenue sharing fees are known to be so-called deadweight costs that directly reduce retirement investment returns.

96.     As alleged above, Defendants, through their Enterprise, have also violated 18 U.S.C. § 1954 by repeatedly using the GoalMaker program to cause retirement plan participants to choose expensive investment options that pay revenue sharing fees to the Prudential Defendants.

97.     As a direct and proximate result, Plaintiff and members of the class have been injured in their business or property by the acts constituting the pattern of racketeering activity here.  Specifically, Plaintiff and members of the class have been injured in their business or property by, among other things, paying higher fees to the Prudential Defendants for retirement investments and accordingly receiving less return on those investments than they would have in the absence of this illegal conduct.  The RICO activities at issue here factually and proximately injured Plaintiff and the proposed class in their business and property. But for this conduct,

Plaintiff and the proposed class would not have been injured as complained of herein. The injury at issue here was not unforeseeable, is not the product of any so-called "intervening causes" and, again, is a direct result of the activities of the RICO enterprise involved here.

98.     Accordingly, Defendants are liable to Plaintiff and the class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for relief as follows:

A.  An order certifying the class pursuant to Federal Rule of Civil Procedure 23;

B.  Awarding compensatory damages to Plaintiff and the members of the class in an amount to be determined at trial;

C.  Awarding treble damages to Plaintiff and the class;

D.  Issuing an order enjoining the Prudential Defendants from further wrongdoing of the kind alleged herein;

E.  Awarding to Plaintiff and the class their costs and attorneys' fees;

F.  Such other relief as may be just and proper.

DATED this 13th day of April, 2018.

By:     */s/ Garrett W. Wotkyns*
Garrett W. Wotkyns
John J. Nestico
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

AMENDED CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

Todd M. Schneider
James A. Bloom
Kyle G. Bates
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com
kbates@schneiderwallace.com

Michael M. Mulder (NDIL No. 01984268)
Elena N. Liveris (NDIL No. 6297048)
THE LAW OFFICES OF
MICHAEL M. MULDER
1603 Orrington, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
Facsimile: (312) 263-2942
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Austin Tighe (NDIL No. 90784528)
NIX PATTERSON & ROACH, LLP
205 Linda Drive
Daingerfield, Texas 75638
Telephone: (903) 645-7333
Facsimile: (903) 645-5389
atighe@nixlaw.com

***Attorneys for Plaintiff***

AMENDED CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5 and Northern District of Illinois Local Rule 5.5, the undersigned, an attorney of record in this case, hereby certifies that on April 13th, 2018, a true and correct copy of **Plaintiff's Amended Class Action Complaint** was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

Dated: April 13th, 2018      By:    */s/ Garrett W. Wotkyns*
                                                   Garrett W. Wotkyns
                                                   SCHNEIDER WALLACE COTTRELL
                                                   KONECKY WOTKYNS LLP
                                                   8501 N. Scottsdale Road, Suite 270
                                                   Scottsdale, Arizona 85253

AMENDED CLASS ACTION COMPLAINT
*GREEN V. MORNINGSTAR, INC., ET AL.*