IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL D. GREEN, Individually and On Behalf of All Others Similarly Situated, *Plaintiff*, v. MORNINGSTAR INVESTMENT MANAGEMENT LLC, PRUDENTIAL INVESTMENT MANAGEMENT SERVICES LLC, and PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, *Defendants*. | No. 17 C 5652 Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Michael Green first filed this putative nationwide class action in August 2017 alleging that Morningstar Investment Management LLC and the Prudential Defendants violated the Racketeer Influenced Corrupt Organizations Act (RICO) because they rigged an investment advice program to automatically select Green's 401(k) retirement plan's mutual funds for him based on which funds shared the most fees with the defendants. (Dkt. 1.) This Court granted the defendants' motions to dismiss that complaint in March 2018 because Green did not plausibly allege that the defendants conducted themselves in an enterprise that engaged in a pattern of racketeering activity. (Dkt. 68.) Green subsequently amended his complaint to cure these flaws (Dkt. 70) but the defendants once again moved to dismiss arguing that Green failed

to do so. (Dkt. 80, 82.) Because the amended complaint still does not state a claim for relief under RICO, and the statute of limitations would bar it anyway, the Court grants the defendants' motions to dismiss (Dkt. 80, 82) with prejudice.

## BACKGROUND

Michael Green participates in his employer's (Rollins Inc.) 401(k) retirement plan, which allows participants to contribute a pre-tax portion of their salaries and wages that their employer can match to encourage individuals to save for retirement. (Dkt. 70 ¶¶ 2, 5.) The participants then choose how the Rollins Plan allocates their savings through investing them among a variety of designated mutual funds. *Id.* ¶ 6. Prudential Retirement Insurance and Annuity Company sold a free, optional computer program named GoalMaker to the Rollins Plan to support and advise the individuals in making their investment decisions. *Id.* ¶¶ 8–9, 13.

GoalMaker automatically allocates a retirement plan participant's savings among various investment options based on the participant's age, income, savings rate, and other data. *Id.* ¶ 9. Morningstar originally developed the technology, but Green alleges that in 2012 Morningstar and potentially one or more of the Prudential Defendants modified it to generate "revenue sharing fees" for the Prudential Defendants by limiting the investment options available to Green and other plan participants. *Id.* ¶¶ 10–12, 28.

Revenue sharing fees are additional non-investment-fees added to a mutual fund's expense ratio not expressly reported to investors that reduce the net return of the fund. *Id.* ¶ 18. Green claims that he would have paid lower fees for his retirement

plan investments had GoalMaker not pushed him to invest his savings in funds that kicked the revenue sharing fees back to the Prudential Defendants. *Id.* ¶ 19. Instead, the defendants configured the computer software to automatically steer Green away from diversifying his investments among the options available in the Plan. *Id.* ¶¶ 14–15.

The defendants so restricted the number and identity of investment options that GoalMaker used through consulting meetings and additional work together. *Id.* ¶¶ 12, 16. In other words, GoalMaker did not consider the Plan's entire menu of designated investment options. *Id.* ¶ 21. In fact, GoalMaker only utilized seven of the sixteen designated investment options offered by the Plan. *Id.* ¶ 22. Then it automatically made Green's investment decisions for him based not on what was in Green's financial interest but what was in the defendants'. *Id.* These high-cost investments caused Green to pay unwarranted fees on his retirement savings. *Id.* ¶ 23.

For instance, GoalMaker includes the Goldman Sachs Mid Cap Value Fund in the mid cap equity asset class instead of the comparable but less expensive Vanguard Mid Cap Index Fund Admiral. *Id.* ¶ 24. On the one hand, the Goldman Sachs fund has a total expense ratio of 1.16% while the Vanguard fund's is only 0.08%. *Id.* On the other hand, the Vanguard fund pays no revenue sharing fees to the Prudential Defendants, however the Goldman Sachs fund does (25-40 basis points). *Id.* By way of another example, GoalMaker includes the American Funds EuroPacific Growth Fund in the international equity asset class, as opposed to the Vanguard Total International Stock Fund Admiral. *Id.* ¶ 25. Like the earlier scenario, the EuroPacific

Growth fund has a total expense ratio of 0.85% compared to the Vanguard fund's 0.12% ratio. *Id.* The Prudential Defendants receive revenue sharing fees from the EuroPacific Growth fund, though, (25 basis points) and not the Vanguard fund. *Id.* Typically, automated advice programs consider all investment options available in a retirement plan and not just the ones that kick fees back to defendants like Prudential. *Id.* ¶ 26.

## STANDARD OF REVIEW

A complaint must "'state a claim to relief that is plausible on its face.'" *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a "'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Conclusory statements do not suffice. *See id.* In construing the complaint, the Court accepts all the well-pleaded facts as true and "'draw[s] all reasonable inferences in favor of the plaintiff.'" *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)).

## ANALYSIS

Green argues that the defendants associated in-fact to form an enterprise to intentionally and systematically influence retirement plan participants to use GoalMaker to invest their savings in high-fee mutual funds that send revenue

sharing fees to the defendants. The defendants contend that Green failed to adequately allege standing, his RICO claim, and that the statute of limitations does not bar his claim.

I.  **RICO Claim**

Civil RICO, 18 U.S.C. § 1964(c), "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1964(c), then, the plaintiff must allege an (1) injury to "his business or property . . ." (2) ". . . by reason of" (3) the defendant's racketeering activity (a 1962 violation). *Id.* So, the plaintiff must predicate her § 1964(c) charge on "a violation of section 1962." § 1964(c). To establish a violation of § 1962(c), the plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017) (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994), in turn quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

Some cases, including *Sabrina Roppo*, refer to the independent § 1964(c) requirements of damages and causation as "standing." *Id.* at 588. But that is a misnomer because "the Supreme Court disapproved of the idea of 'prudential' standing" in *Lexmark International, Inc. v. Static Control Components*, 572 U.S. 118 (2014). *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733–34 (7th Cir. 2014); *see Fiala v. B & B Enterprises*, 738 F.3d 847, 850 (7th Cir. 2013) (stating that RICO standing

"really ought to be called a limitation on the relief available for a RICO violation"); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 887 (10th Cir. 2017) ("Of course, what we once called "RICO standing" or "statutory standing" we now properly characterize as the usual pleading-stage inquiry: whether the plaintiff has plausibly pled a cause of action under RICO.").

Here, the parties also referred to this concept as "standing," however what they really contest is causation. Properly understood, causation is an element of a § 1964(c) claim that a plaintiff must plead because it is indeed a statutory prerequisite. It is unclear whether the four § 1962(c) requirements are conditions precedent to the two § 1964(c) elements or if it is perhaps the other way around. Regardless of the analytical framework, a plaintiff must allege *all* six to state a civil RICO claim: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that causes (6) damages (to the plaintiff's business or property).

### A. Conduct of an Enterprise

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). One type of enterprise, an "association-in-fact," consists of three structural features: (1) purpose; (2) relationships; and (3) longevity. *See Sabrina Roppo*, 869 F.3d at 588 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010). The plaintiff must identify people or entities—the defendants—that are distinct from the RICO enterprise itself. *See id.* (citations omitted); *United*

*Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013). Put differently, the enterprise must not be the same entities named as defendants just referred to in a different way; there really must be a distinction between the defendants and the enterprise. *See id.* at 854. For the defendants must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just its own affairs." *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (brackets omitted) (emphasis in original). In this context, conduct means that the defendant operated or managed the enterprise and played some role in directing its affairs. *See Sabrina Roppo*, 869 F.3d at 589.

The defendants attack Green's alleged common purposes for the enterprise: to enrich the defendants with revenue sharing fees and obtain a leading position in the market for retirement plan automated investment advice programs. The way the defendants see it, the two are actually one and the same—a shared goal of financial profit. If that is so, then the defendants point back to this Court's prior ruling that such a shared goal does not qualify as a common purpose under RICO. This argument boils down to whether the alleged common purposes of the enterprise can be teased apart from the independent purposes of the individual defendants. Because, on the one hand, two or more companies conducting their own businesses and then working together to make money does not run afoul of RICO. On the other hand, two or more companies that go outside the bounds of their own affairs to financially profit in a new and unique business between them might violate the statute. The key is the

dividing line between the enterprise and the individual entities that associate together to form it.

Here, the Court can assume that Green sufficiently alleged the three structural features of an association-in-fact enterprise: purpose, relationships, and longevity. But once again Green failed to distinguish between the illicit purpose of the enterprise and the lawful purpose of the defendant businesses. There is nothing inherently nefarious about the defendants wanting to become a leader in the market for retirement plan automated investment advice programs to maximize their profits. It follows, then, that the complaint does not adequately state that the defendants participated in the affairs of the enterprise as opposed to pursuing their own affairs. *See Walgreen*, 719 F.3d at 854–55 (describing how each company was responsible for its own specific service in a commercial transaction and went about its own business within the process, rather than improperly taking over corporate operations for illegal means).

Even if the defendants participated in the enterprise's affairs, that remains insufficient because Green must allege that the defendants conducted—meaning they operated or managed—the enterprise. *See Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998), *holding modified by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). Green clearly alleged the existence of a business relationship between the defendants but did not claim that all three defendants directed the enterprise's affairs. To be sure, the defendants seemed to be involved with one another through meetings, trainings, and otherwise consulting on projects. But

regular corporate communication and transactions show only that "the defendants had a commercial relationship, not that they had joined together to create a distinct entity" with the goal of making enough money off GoalMaker to become a market leader. *Walgreen*, 719 F.3d at 855 (citing *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399–400 (7th Cir. 2009) (considering a garden variety marketing arrangement)).

In other words, alleged communications and actions must be undertaken on behalf of the enterprise and not the defendant entities in their individual capacities "to advance their individual self-interests." *Id.* By way of example, Green asserts that Morningstar originally developed GoalMaker and consulted with the Prudential Defendants regarding the program for a flat fee. But "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)[.]" *Goren*, 156 F.3d at 728. Moreover, the flat fees that Morningstar received for its services to the Prudential Defendants did not represent profits "siphoned off to the [ ] enterprise or to individual enterprise members." *Walgreen*, 719 F.3d at 855. At day's end, the amended complaint suffers from the first flaw its predecessor did: failure to allege that this "enterprise" was anything more than a run-of-the-mill business deal.

### B. Pattern of Racketeering Activity

A pattern of racketeering activity "requires the completion of at least two predicate acts." *Bielfeldt v. Graves*, 726 F. App'x 488, 490 (7th Cir. 2018) (citing *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 963 (7th Cir. 2000), then citing 18 U.S.C. § 1961(5)). A plaintiff alleging predicate acts of fraud must do so with

particularity for both acts. *See Goren*, 156 F.3d at 729 (citing Fed. R. Civ. P. 9(b)). Additionally, the plaintiff must assert "'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Id.* (quoting *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)).

The "two violations of a specified list of criminal laws . . . must exhibit continuity plus relationship." *Sabrina Roppo*, 869 F.3d at 589 (internal quotation marks omitted). "Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)) (internal quotation marks omitted)). "Continuity is 'centrally a temporal concept.'" *Empress Casino Joliet Corp.*, 831 F.3d at 828. (quoting *H.J. Inc.*, 492 U.S. at 242). Analytically speaking, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc*, 492 U.S. at 241).

In this case, even assuming Green sufficiently alleged relatedness and continuity, Green must still plausibly state the two predicate acts that makeup the defendants' pattern of racketeering activity: violations of 18 U.S.C. § 1954 and 18 U.S.C. § 664. The first statute proscribes retirement plan kickbacks and "makes it a felony for a pension-plan administrator to receive a gift or other thing of value 'because of

or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan.'" *United States v. Kisting*, 159 F. App'x 726, 728 (7th Cir. 2005) (quoting § 1954(1)). The provision does not prohibit, however, "'payment to or acceptance by any person of bona fide salary . . . for services actually performed.'" *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 710–11 (2d Cir. 2010) (quoting § 1954); *see United States v. DiPace*, 203 F. App'x 368, 369–70 (2d Cir. 2006) (stating that received fees must be disclosed).

With respect to the second criminal law, it forbids embezzlement from retirement plans, which occurs when an individual "'embezzles, steals, or unlawfully and willfully abstracts or converts' any money from an ERISA employee benefits plan for 'his own use or . . . the use of another.'" *United States v. Whitfield*, 663 F. App'x 400, 407 (6th Cir. 2016) (quoting § 664); *see United States v. Lobacz*, 603 F. App'x 48, 51 (2d Cir. 2015). The defendant must specifically intend "to deprive the plan of its funding." *Id.* (citation omitted).

Here, the defendants argue that that alleged wrongful conduct—the Prudential Defendants' receipt of revenue sharing payments—does not plausibly state a claim under the statutes (therefore wiping out the pattern of racketeering activity) because revenue sharing is lawful and the defendants fully disclosed the consensual revenue sharing fees to the Plan, including its participants. In his response, Green effectively concedes that revenue sharing does not in and of itself contravene ERISA or the statutory provisions that he says the defendants violated. (Dkt. 90 ¶¶ 5–6.) True, disclosed and consensual revenue sharing does not sufficiently state a claim

under ERISA. *See Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 6–7 (2d Cir. 2017); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013); *Tibble v. Edison Int'l*, 729 F.3d 1110, 1131 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015); *Hecker v. Deere & Co.*, 556 F.3d 575, 584 (7th Cir. 2009). The same view of alleged kickbacks holds true under 18 U.S.C. § 1954 and 18 U.S.C. § 664. *Cf. Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569–70 (7th Cir. 1991).

The key, then, is whether the defendants disclosed the fee-sharing arrangement and agreed on it with the Plan administrator. Green admits they did (Dkt. 90 ¶ 15), and even assuming Green alleged that the defendants received revenue sharing payments without the consent or knowledge of the Plan and its participants (a debatable proposition at best), he did not "distinguish between ordinary compensation for services in the form of revenue-sharing payments and illicit kickbacks." *Rosen*, 718 F. App'x at 7.

The problem for Green is that, in simple terms, the defendants cannot kick back or embezzle dollars that, when all is said and done, they do no control. Like the plaintiffs in *Leimkuehler* and *Hecker*, Rollins has the ultimate authority over the selection of funds, not the defendants. *See* 713 F.3d at 911–12; 556 F.3d at 584. On top of that, Rollins includes GoalMaker as an optional service and plan participants choose how they want their accounts to be invested amongst the mutual fund alternatives, which includes deciding whether to empower GoalMaker to make those

choices for them. (Dkt. 70 ¶ 6.) Green acknowledges as much; any inconsistent allegations are therefore implausible and not particular enough to satisfy Rule 9(b). *Id.*

In so concluding, the Court need not reach the defendants' other contentions, including that the relevant contract sets revenue sharing at a fixed percentage (returning any excess received to the Plan) and two of the seven GoalMaker options did not pay any revenue sharing to the defendants. (Dkt. 85 at 4, 12 n.5.) Because Green failed to allege that the revenue sharing fees were not disclosed or non-consensual, he cannot adequately state a pattern of racketeering activity. Even if Green so alleged, the fact remains that Rollins' and Green's actions deprived the defendants of any ability to enrich the defendants at Green's expense.

**C.      Causation**

For the same reasons Green cannot allege a pattern of racketeering activity, he also cannot allege that the defendants caused his injury. "A RICO plaintiff's injuries must be 'by reason of' a violation of § 1962 . . . This requires a showing of 'but for' causation and proximate cause." *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (citing *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004)). Regarding proximate cause, the defendants' rigging of GoalMaker to raise their revenue sharing fees must be "sufficiently immediate to serve as a legal cause" of Green's higher fee payments on his investments in certain mutual funds. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014). "The focus of the inquiry is the directness of the injury resulting from the defendants' conduct." *Id; see*

*also Rock v. BAE Sys., Inc.*, 556 F. App'x 869, 872 (11th Cir. 2014) (asking "whether the alleged violation led directly to the plaintiff's injuries").

In this case, GoalMaker's alleged siphoning of fee sharing payments to the defendants did not proximately cause Green to pay higher fees on his plan investments. Indeed, Green's claim is impermissibly attenuated because the sequence of events that must occur to injure him involves too many intervening and independent decisions, like: (1) Rollins' selection of the mutual funds made available as options to the plan participants; (2) Rollins' election to allow the plan participants to use GoalMaker (an optional service that Rollins could or could not provide) if they wanted to; (3) Rollins' choice to pick out a subset of the plan options for GoalMaker to utilize (which allegedly paid higher fees than the other investment options offered by Rollins); and (4) with the foregoing disclosed, Green's decision to use GoalMaker. Suffice it to say, this "causal chain" is "too long." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 577–78 (7th Cir. 2017).

Green, for his part, does not dispute most of the links in the causal chain apart from the third: Rollins' selection of the investment options for GoalMaker to employ. (Dkt. 90 ¶ 25.) Even if Rollins did not affirmatively make these choices and GoalMaker did, the remaining three decisions do, in fact, "sever the chain of RICO causation." *Id.* ¶ 23. It is not, as Green contends, that Rollins potentially failed to discover the high fees; instead, Green's claim fails because it requires a "multi-step analysis," which on its face shows that the defendants' alleged misconduct did not by itself immediately harm Green. *Cf. Empress Casino Joliet Corp.*, 763 F.3d at 733. In

other words, the conduct directly causing the harm (Green's use of GoalMaker) was distinct from the conduct giving rise to the fraud (the rigging of GoalMaker) because too many things had to happen in between. *Cf. id.*

Green cites *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), for support, but that case acknowledges the principle that leads to his claim's demise here:

> too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur—so many unexpected things that the defendant couldn't have foreseen the effect of his wrongdoing and therefore couldn't have been influenced, in deciding how much care to employ in the activity that produced the wrongful act, by the prospect of inflicting such an injury as occurred.

637 F.3d at 754. Because the independent decisions of Rollins and Green make the causal chain too attenuated, Green fails to plausibly allege proximate cause, and consequently the Court need not analyze but-for causation. *See Leimkuehler*, 713 F.3d at 912 (recognizing that "the cheapest option may not inevitably be the best option," that "[t]here is also no particular reason to think that [the defendant] would not seek to make up the revenue it missed by offering cheaper share classes by charging higher direct fees to plans like [the plaintiff's]," and that "[the plaintiff] was free to seek a better deal with a different 401(k) service provider if he felt that [the defendant's] investment options were too expensive.").

## II. Statute of Limitations

Assuming for the sake of argument that Green sufficiently stated his RICO claim, the statute of limitations would still bar it. A civil RICO claim must be brought within four years of the date the plaintiff discovered, or should have discovered, that

the defendants injured her.  *See, e.g.*, *Foster v. Local Union 8A-28A Metal Refinishers, Painters, Sign & Display, Equip. & Auto. Painters, & Allied Trades*, No. 16 C 4174, 2017 WL 4150683, at *5 (N.D. Ill. Sept. 18, 2017) (citing *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010)).  Subsequent injuries (after the required two predicate acts occur) do not toll the statute's running.  *See Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008).  The victim need only discover the injury (and injurer), not "the facts that establish a particular legal theory," to "start[ ] the limitation periods running."  *Jay E. Hayden Found.*, 610 F.3d at 387.  In RICO cases, then, "the victim doesn't have to know he's been injured by a RICO violation, which is to say by a *pattern* of racketeering activity (that is, a series of predicate acts)."  *Id.* (emphasis in original).

Here, Green alleges that the enterprise began no later than in 2012.  (Dkt. 70 ¶ 28.)  He also concedes that he could have discovered the revenue sharing fees years ago based on the defendants' disclosures.  (Dkt. 90 ¶ 15.)  Therefore, Green should have discovered his injury in 2012, meaning that he had until 2016 to sue the defendants.  Green filed in 2017, so he argues against this untimely result asserting that he could not have discovered that these payments were *injuring* him, meaning that a rigged computer program was automatically selecting the funds that would kick back the most fees to the defendants.  *Id.*

In so doing, Green misconstrues the true nature of the harm he alleges and its effect on the statute of limitations.  As it happens, Green's purported damages are the higher fees that he would not have paid had he known that they were passing

through to make the defendants wealthier, not the development and deployment of GoalMaker, which is the alleged cause of the harm (and therefore the legal violation). It was Green's opportunity to discover the revenue sharing fees and the defendants (the factual injury of less money in his pocket), not the alleged RICO enterprise's racketeering (the legal theory), that cued the statute of limitations. *See Jay. E. Hayden Found.*, 610 F.3d at 387. As a final point, although the statute of limitations is a defense that Green need not anticipate nor refute in his complaint, his allegation that the enterprise began in 2012 facially shows that the statute bars relief here. *See Limestone Dev. Corp.*, 520 F.3d at 802.

## CONCLUSION

Green may be able to plausibly allege a garden-variety state law fraud claim, but a federal RICO action is not the proper vehicle for such a claim. The Court accordingly grants the defendants' motions to dismiss (Dkt. 80, 82) with prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: January 16, 2019